# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

|  |  |  |
|---|---|---|
| GEORGIA ADVOCACY OFFICE *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | CIVIL ACTION |
| | ) | |
| v. | ) | NO. 1:19-CV-1634-WMR-JFK |
| | ) | |
| THEODORE JACKSON *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

Devon Orland
Anne Kuhns
GEORGIA ADVOCACY OFFICE
1 West Court Square
Suite 625
Decatur, Georgia 30030
(404) 885-1234
dorland@thegao.org

Sarah Geraghty
Aaron Littman
Ryan Primerano
SOUTHERN CENTER
FOR HUMAN RIGHTS
83 Poplar Street, NW
Atlanta, Georgia 30303
(404) 688-1202
sgeraghty@schr.org

*Counsel for Plaintiffs*

May 7, 2019

# TABLE OF CONTENTS

**PAGE**

TABLE OF AUTHORITIES ................................................................ iii

INTRODUCTION .............................................................................1

STATEMENT OF FACTS ..................................................................2

    A.    Defendants Use Solitary Confinement to Isolate M.J., K.H., and Other Women Who Experience Psychiatric Disabilities.......................................................................2

    B.    Solitary Confinement Causes Serious Psychological Harm to People Who Experience Psychiatric Disabilities ............................17

ARGUMENT ...................................................................................22

I.    Plaintiffs Meet the Requirements for a Preliminary Injunction ...................22

    A.    Plaintiffs Likely Will Succeed on the Merits of Their Challenge to the South Fulton Jail's Conditions of Confinement .......................................................................22

        1.    Solitary confinement violates Plaintiffs' rights under the Eighth and Fourteenth Amendments ........................22

            a.    Solitary confinement presents a substantial risk of serious psychological harm .................................23

            b.    Defendants are aware of but have failed to respond reasonably to the risk of serious harm posed by their solitary confinement policies and practices ....................................................27

        2.    Solitary confinement violates Plaintiffs' rights under the Americans with Disabilities Act ...............................28

B.    Plaintiffs Will Suffer Irreparable Harm If They Remain in Solitary Confinement ..........................................................................32

C.    The Harm Caused by Keeping Plaintiffs in Solitary Confinement Exceeds the Harm That an Injunction Would Cause Defendants ................................................................................33

D.    A Preliminary Injunction Will Serve the Public Interest ...................34

II.    The Court Should Enter a Preliminary Injunction, Order Expedited Discovery, Hold an Evidentiary Hearing Within 90 Days, and Find That the Relief Ordered Satisfies the Prison Litigation Reform Act (PLRA).....................................................................34

CONCLUSION ...........................................................................................37

CERTIFICATE OF COMPLIANCE

EXHIBITS

# TABLE OF AUTHORITIES

PAGE

## CASES

*Bircoll v. Miami-Dade Cty.*,
 480 F.3d 1072 (11th Cir. 2007) ..........................................................29

*Braggs v. Dunn*,
 257 F. Supp. 3d 1171 (M.D. Ala. 2017) ......................................26, 32

*Brooks v. Warden*,
 800 F.3d 1295 (11th Cir. 2015) ..........................................................24

*Brown v. Plata*,
 563 U.S. 493 (2011).............................................................23, 24

*Canupp v. Paul*,
 716 F. App'x 836 (11th Cir. 2017) .....................................................23

*Casey v. Lewis*,
 834 F. Supp. 1477 (D. Ariz. 1993) .....................................................26

*Cash v. Smith*,
 231 F.3d 1301 (11th Cir. 2000) ..........................................................28

*Cason v. Seckinger*,
 231 F.3d 777 (11th Cir. 2000) ............................................................35

*Coleman v. Brown*,
 28 F. Supp. 3d 1068 (E.D. Cal. 2014) ...............................................26

*Daker v. Warren*,
 660 F. App'x 737 (11th Cir. 2016) .......................................................2

*Farrow v. West*,
 320 F.3d 1235 (11th Cir. 2003) ...................................................27, 28

*G & V Lounge v. Mich. Liquor Control Comm'n*,
 23 F.3d 1071 (6th Cir. 1994) ..............................................................34

*Graves v. Arpaio*,
    48 F. Supp. 3d 1318 (D. Ariz. 2014) .................................................................26

*Hardwick v. Ault*,
    447 F. Supp. 116 (M.D. Ga. 1978) ..................................................................25

*Helling v. McKinney*,
    509 U.S. 25 (1993)...........................................................................................24

*Hope v. Pelzer*,
    536 U.S. 730 (2002)..........................................................................................24

*Indiana Prot. and Adv. Serv. Comm'n v. Comm'r, Ind. Dep't of Corr.*,
    No. 1:08-CV-1317, 2012 WL 6738517 (S.D. Ind. Dec. 31, 2012) ...................26

*Jones El v. Berge*,
    164 F. Supp. 2d 1096 (W.D. Wis. 2001) ......................................................25, 26

*LaMarca v. Turner*,
    995 F.2d 1526 (11th Cir. 1993) ...................................................................23, 27

*Langley v. Coughlin*,
    715 F. Supp. 522 (S.D.N.Y. 1989) ..................................................................26

*Lebron v. Sec'y, Fla. Dep't of Children and Families*,
    710 F.3d 1202 (11th Cir. 2013) .......................................................................22

*Loyd v. Ala. Dep't of Corr.*,
    176 F.3d 1336 (11th Cir. 1999) .......................................................................35

*Madrid v. Gomez*,
    889 F. Supp. 1146 (N.D. Cal. 1995) ................................................................26

*Odebrecht Const., Inc. v. Sec'y, Fla. Dep't of Transp.*,
    715 F.3d 1268 (11th Cir. 2013) ...................................................................33, 34

*Pa. Dep't of Corr. v. Yeskey*,
    524 U.S. 206 (1998)..........................................................................................29

*Ruiz v. Johnson*,
    37 F. Supp. 2d 855 (S.D. Tex. 1999) ..................................................26

*Scott v. Roberts*,
    612 F.3d 1279 (11th Cir. 2010) .........................................................32

*Thomas v. Bryant*,
    614 F.3d 1288 (11th Cir. 2010) ..................................................*passim*

*United States v. Sec'y, Fla. Dep't of Corr.*,
    778 F.3d 1223 (11th Cir. 2015) .........................................................35

## STATUTES

18 U.S.C. § 3626 ...........................................................................................35

29 U.S.C. § 794e ............................................................................................1

42 U.S.C. §§ 10801 et seq. .............................................................................1

42 U.S.C. § 12102 .........................................................................................29

42 U.S.C. § 12131 .........................................................................................29

42 U.S.C. § 12132 .........................................................................................28

42 U.S.C. §§ 15001 et seq. .............................................................................1

## OTHER AUTHORITIES

Am. College of Corr. Physicians, *Position Statement: Restrictive
    Housing of Mentally Ill Inmates* (July 9, 2013) ...............................18

Am. Psych. Ass'n, Position Statement, *Segregation of Prisoners with
    Mental Illness* (2012) .........................................................................21

Am. Pub. Health Ass'n, Policy No. 201310, *Solitary Confinement as a
    Public Health Issue* (2013) .................................................................20

Craig Haney, *Mental Health Issues in Long-Term Solitary and 'Supermax' Confinement*, 49 Crime & Delinquency 124 (2003)......................19

Craig Haney, *The Psychological Effects of Solitary Confinement: A Systematic Critique*, 47 Crime & Justice 365 (2018) ........................18

Craig Haney, *The Social Psychology of Isolation: Why Solitary Confinement Is Psychologically Harmful*, 181 Prison Serv. J. 12 (2009) ...................................................................................................17

David H. Cloud, *et al.*, *Public Health and Solitary Confinement in the United States*, 105 Am. J. of Pub. Health 18 (2015) .........................18

Fatos Kaba et al., *Solitary Confinement and Risk of Self-Harm Among Jail Inmates*, 104 Am. J. Pub. Health 442 (2014) .............................19

Jeffrey Metzner et al., *Solitary Confinement and Mental Illness in U.S. Prisons: A Challenge for Medical Ethics*, 38 J. Am. Acad. Psych. & L. 104 (2010) ...............................................................11, 20, 21, 25

Jeffrey Metzner et al., *An Overview of Correctional Psychiatry*, 29 Psych. Clin. N. Am. 761 (2006) .........................................................26

Jeffrey Metzner, *Class Action Litigation in Correctional Psychiatry*, 30 J. Am. Acad. Psych. & L. 19 (2002)..................................................31

Nat'l Comm'n on Corr. Health Care, Position Statement, *Solitary Confinement (Isolation)* (Apr. 2016) ................................................21

*Reassessing Solitary Confinement: Hearing Before the Subcomm. on the Constitution, Civil Rights, and Human Rights of the S. Comm. on the Judiciary*, 112th Cong. 21 (2012).........................................20

Sarah Glowa-Kollisch et al., *From Punishment to Treatment: The 'Clinical Alternative to Punitive Segregation' (CAPS) Program in New York City Jails*, 13 Int'l J. Environ. Res. & Pub. Health 182 (2016).............................................................................................30, 31

United Nations Standard Minimum Rules for the Treatment of
    Prisoners (2015) ................................................................................................17

**INTRODUCTION**

Like many other women, Plaintiffs M.J. and K.H. are confined to isolation cells 23 to 24 hours every day for months on end only because of their psychiatric disabilities.[1]  In being subjected to prolonged periods of isolation, these women are deprived of necessary mental health care, and are thus at substantial risk of serious psychological harm.  The women are further denied reasonable accommodations to allow them the programs and activities provided to non-disabled inmates.

Because Defendants' solitary confinement practices violate Plaintiffs' federal rights and cause them irreparable harm, the Court should enter a preliminary injunction ordering Defendants to offer at least four hours of daily out-of-cell time to women assigned to B-Pod, C-Pod, and G-Pod, and to develop and present to the court for approval a plan to provide a medically appropriate environment to Plaintiffs and other women who experience psychiatric disabilities assigned to B-Pod, C-Pod, and G-Pod.

---

[1] Plaintiff Georgia Advocacy Office ("GAO") is a protection and advocacy system charged with protecting the rights of individuals with disabilities.  *See* 42 U.S.C. §§ 10801 et seq.; *id.* at §§ 15001 et seq; 29 U.S.C. § 794e.  It asserts associational standing on behalf of the members of the proposed class, who are its constituents. GAO joins in this motion seeking preliminary injunctive relief to protect its constituents from harm.

## STATEMENT OF FACTS

### A.    Defendants Use Solitary Confinement to Isolate M.J., K.H., and Other Women Who Experience Psychiatric Disabilities.

Plaintiffs M.J. and K.H. are or will be incarcerated[2] in the South Fulton Jail for minor misdemeanors.  M.J. was arrested and charged with criminal trespassing in October 2018 for allegedly refusing to leave the West End Mall.  (M.J. Decl. ¶ 3 (Ex. A-1).)  K.H. was arrested and charged with criminal trespassing and prowling on November 3, 2018.  (K.H. Decl. ¶ 3 (Ex. A-2).)  M.J. and K.H. remain in custody—months after their arrests—only because they cannot pay the $500 bonds that have been set in their respective cases.  (M.J. Decl. ¶ 4; K.H. Decl. ¶ 4.)

M.J. and K.H. experience psychiatric disabilities.[3]  They are not alone in that regard.  The South Fulton Jail holds over 200 women,[4] and half or more of them experience psychiatric disabilities.[5]  A quarter "are receiving medications for

---

[2] Plaintiff M.J. has been temporarily moved from the jail to a state hospital for competency restoration but expects to return to the jail again in the near future. Therefore, M.J. continues to have standing to seek injunctive relief regarding conditions in the jail.  *See Thomas v. Bryant*, 614 F.3d 1288, 1319 (11th Cir. 2010); *see also Daker v. Warren*, 660 F. App'x 737, 748 (11th Cir. 2016).

[3] M.J. and K.H. have been found incompetent to stand trial.

[4] As of April 30, 2019, the jail held 214 women.  (Jail Census Report (Ex. H).)

[5] Fulton Cty. J. & Mental Health Task Force, *Final Report* 29 (2017) (Ex. G-4).

mental health issues."[6] When these women display symptoms of their psychiatric disabilities, Defendants segregate them from the general jail population[7] in B-Pod, C-Pod, and G-Pod.  (*See, e.g.*, C.O. Decl. ¶ 5 (Ex. A-7); B.W. Decl. ¶ 2 (Ex. A-6); K.H. Decl. ¶ 6.)

Women in B-Pod, C-Pod, and G-Pod spend the vast majority of their time confined to small cells.  For example, M.J. has been allowed out of her B-Pod cell for "about one hour per day" at most and sometimes goes "days without being let outside of [her] cell."[8]  Similarly, K.H. gets out of her C-Pod cell "about one hour per day" at most and "often go[es] days at a time without being let out of [her] cell, even though [she] is desperate to come out, and even though [she] ask[s] officers to please give [her] some time in the dayroom."  (K.H. Decl. ¶¶ 7-8.)

---

[6] Fulton Cty. Sheriff's Office, *Response to the AJC Concerning Inmates with Mental Illness*, Aug. 31, 2018 (Ex. G-2).  As the Fulton County Superior Court notes in a statement on its official website, "These numbers make the Fulton County Jail the largest de facto mental health facility in Georgia with half of the jail's 2,000-plus detainees receiving some type of mental health services."  Super. Ct. of Fulton Cty., *Accountability Courts—Behavioral Health Treatment Court* (Ex. G-3).

[7] Fulton Cty. Sheriff's Office, Jail Bureau Policy No. 2100-01, *Classification of Inmates* 13 (Jan. 1, 2002) (Ex. I-4); Fulton Cty. Sheriff's Office, Jail Bureau Policy No. 1000-01, *Single Occupancy Cells/Rooms* 1 (July 15, 2013) (Ex. I-2).

[8] (M.J. Decl. ¶¶ 9-11; *see id.* ¶ 11 ("Just last week, I went three days being inside my cell around the clock . . . .  I wasn't permitted a shower for those three days in a row. On the third day, I was let out only because staff persons from the Georgia Advocacy Office asked to speak to me.").)

Like M.J. and K.H., other women in B-Pod, C-Pod, and G-Pod are confined to their cells for days at a time.  (B.W. Decl. ¶ 8 (stating that "[i]t is not unusual to go several days without free time" and noting that some women are "rarely if ever" offered out-of-cell time).)  Official logbooks maintained by Defendants[9] and attached as exhibits to this motion confirm that M.J., K.H., and other women in the mental health pods are often confined to their cells for days, without any respite, or even the opportunity to bathe.  Detainees apparently are told that the jail customarily provides one hour per day of out-of-cell time (M.J. Decl. ¶ 10), but the reality, even as to their so-called custom, is much less.  To take only a few representative examples, logbook entries in December 2018 show that the ten cells in G-Pod—designated "G10" to "G24"—were offered or provided out-of-cell time an average of about five days out of the month, with over half of the cells receiving even less than that.  The following chart summarizes the December 2018 logbook entries for G-Pod:

---

[9] *See* Fulton Cty. Sheriff's Office, Jail Bureau Policy No. 0600-05, *Daily Logbooks and Reports/Permanent Log* 2-3 (Dec. 15, 2011) ("Logbooks will contain, at a minimum, but not limited to the following information: . . . [t]he starting and completion times for recreation . . . .") (Ex. I-1); Fulton Cty. Sheriff's Office, Jail Bureau Policy No. 2900-01, *Comprehensive Recreational Program* 1 (Jan. 1, 2002) ("Records will be maintained on inmate participation or refusal [of recreation or "leisure activities"] in the Daily Logbook . . . .") (Ex. I-5).



**December 2018 Out-of-Cell Time: G-Pod**
(Source: South Fulton Jail East Wing Logbook)

| | G10 | G11 | G12 | G13 | G14 | G20 | G21 | G22 | G23 | G24 |
|---|---|---|---|---|---|---|---|---|---|---|
| Days Offered Out-of-Cell Time | 0 | 5 | 1 | 8 | 7 | 13 | 3 | 1 | 4 | 4 |
| Days Denied Out-of-Cell Time | 31 | 26 | 30 | 23 | 24 | 18 | 28 | 30 | 27 | 27 |

(*See* Ex. E-1.)  Similarly, January 2019 logbook entries for C-Pod show that the ten cells in that housing unit were offered or provided the customary hour or so of out-of-cell time an average of about eight days out of that month:



**January 2019 Out-of-Cell Time: C-Pod**
(Source: South Fulton Jail West Wing Logbook)

| | C10 | C11 | C12 | C13 | C14 | C20 | C21 | C22 | C23 | C24 |
|---|---|---|---|---|---|---|---|---|---|---|
| Days Offered Out-of-Cell Time | 11 | 1 | 10 | 7 | 5 | 9 | 8 | 13 | 6 | 13 |
| Days Denied Out-of-Cell Time | 20 | 30 | 21 | 24 | 26 | 22 | 23 | 18 | 25 | 18 |

(*See* Ex. F-1; Ex. F-2.)  And February 2019[10] logbook entries for B-Pod reflect the

same pattern, with cells offered out-of-cell time an average of 11 days per month,

spending an average of 17 days of that month with no out-of-cell time:



(Ex. F-3; Ex. F-4.)

Despite knowing that this kind of involuntary segregation harms women's

mental health and raises serious constitutional concerns,[11] Defendants continue to

leave many women who experience psychiatric disabilities confined to their cells

without respite.  The following chart depicts the number of days on which out-of-

---

[10] GAO began a series of several inspections of the South Fulton Jail in February
2019.

[11] *See* Ltr. to Sheriff Jackson et al., Aug. 17, 2018 (Ex. G-1).

cell time was denied to each "mental health pod" cell during the month of March 2019[12]:



(Ex. E-6; Ex. E-7; Ex. F-5; Ex. F-6.)[13]  These logbook entries confirm the allegations of M.J., K.H., and others that people assigned to these pods often go days without being allowed out of their cells.  Taking only a few of many examples, the logbooks do not show M.J. leaving her cell at all from March 16 through 21, or K.H. leaving her cell from March 8 through 16.  (Ex. F-5; Ex. F-6.)

---

[12] Cell G13 is omitted from this chart because that cell is believed to have been unoccupied during most or all of March.  The logbooks for March appear to be missing entries for March 30 and 31; those two days were counted as denials of out-of-cell time on the above chart.

[13] Some women in the mental health pods get out of their cells more often than others.  The women who leave their cells least "are the ones who seem to have more severe mental illnesses, such as people who play with their own feces or talk to themselves."  (B.W. Decl. ¶ 9.)

On the sporadic occasions when it occurs, the limited out-of-cell time provided—generally an hour at a time, and sometimes less—does little to ameliorate the harms of the isolation to which women are subjected.  When M.J., K.H., and other women are permitted out of their cells, they are typically confined to the pod's small common area where there is nothing to do and no opportunity for meaningful social interaction.   (M.J. Decl. ¶ 9, 17; K.H. Decl. ¶ 7.)  After an hour in the common area, the women are locked in their cells.  They do not come out again until their next hour of out-of-cell time, which, as noted above, may be days away.

While there is an outside recreation area at the jail, women in B-Pod, C-Pod, and G-Pod are rarely permitted outside.  (M.J. Decl. ¶ 14 (stating that she had been permitted outside two times in four months of incarceration); K.H. Decl. ¶ 9 (stating that "for most of my time in this jail, we almost never went outside," and noting that she was permitted outdoor time once between November 2018 and March 2019).)  Defendants' logbooks confirm that outdoor recreation is provided to people in the "mental health pods" as infrequently as once or twice per month, and less often for some detainees.  (*See* Ex. E-1; Ex. E-2; Ex. E-3; Ex. E-4; Ex. E-5; Ex. E-6; Ex. E-7; Ex. F-1; Ex. F-2; Ex. F-3; Ex. F-4; Ex. F-5; Ex. F-6.)

Isolated in solitary confinement cells for most of the day and night with nothing to do, women with psychiatric disabilities often sleep (or try to sleep) all day, every day. (*See, e.g.*, Ex. B.)  Women in the mental health pods are deprived of access to books, newspapers, magazines, and television. (*See, e.g.*, M.J. Decl. ¶ 17; P.B. Decl. ¶ 11; S.P. Decl. ¶¶ 9, 16; B.W. Decl. ¶ 10.)  As reflected in photographs taken during recent visits conducted in the middle of the day, person after person can be observed lying prone and motionless on her bed or on the floor. (*See* Ex. B.)

A significant number of the women in B-Pod, C-Pod, and G-Pod have difficulty caring for themselves.  Some "stop bathing altogether," and others "go through episodes where they sit in their room playing with their own feces," "spread feces on the walls or their bodies," "defecat[e] in the showers," speak incoherently, or flood their cells. (*See, e.g.*, B.W. Decl. ¶¶ 12-14, 17, 21.)  Photographs taken during recent visits to the South Fulton Jail are illustrative. (*See* Ex. B.)  A number of cells had garbage strewn around inside of them. (*Id.* (Images 8, 13, 16, 20, 40).)  The walls of several cells displayed messages written in what appeared to be feces or food. (*Id.* (Images 14-15).)  A stream of urine flowed out of one woman's cell. (*Id.* (Image 18).)  Soiled clothing lay discarded in common areas or inside the cells. (*Id.* (Images 20, 25-26, 40, 55-56).)  Lacking anything

else to do, many of the women were found sleeping in the middle of the day. (*Id.* (Images 3, 5, 10-11, 27-32, 39, 41, 45-49, 51, 53).) The following representative photographs were taken during visits to the jail between February and April 2019:



Woman sleeping on floor of cell.



Message apparently written with food or feces on cell wall.



Woman sleeping without bedding.



Urine running from cell.



Assorted images reflecting lack of self-care.

As discussed in more detail below, isolation of people with psychiatric

disabilities exacerbates symptoms of mental illness and "can be as clinically

distressing as physical torture."[14]  M.J. and K.H. are suffering that distress.  M.J.

reports that the isolated conditions of confinement have made her depressed and

---

[14] Jeffrey Metzner et al., *Solitary Confinement and Mental Illness in U.S. Prisons: A Challenge for Medical Ethics*, 38 J. Am. Acad. Psych. & L. 104, 106 (2010).

increasingly suicidal.  (M.J. Decl. ¶ 18.)  On February 14, 2019—after she had spent around four months in a B-Pod isolation cell—M.J. presented as "unkempt" and was wearing "soiled garments."  (M.J. Med. Records 4-5 (Ex. C-1).)  She reported that she wanted to kill herself.  The following morning, officers found M.J. "with [a] make shift 'noose' from [a] bed sheet around [her] neck and 'pulling down' on [the] sheet."  (M.J. Med. Records 3-4, 21.)  She was placed naked in a padded cell for four days (M.J. Med. Records 3; M.J. Decl. ¶ 18), after which she was returned to B-Pod.[15]  Less than three weeks later, M.J. again attempted to commit suicide by using a bed sheet to hang herself.  (M.J. Med. Records 8.)  As before, she was placed on suicide watch for four days before being returned to her isolation cell in B-Pod.  (M.J. Med. Records 6-8.)

---

[15] Although it is beyond the scope of the present motion, the conditions to which women are subjected when they are placed on suicide watch are themselves cruel and unusual.  As one woman notes in her declaration, "being on suicide watch is a horrible experience" that entails being "forced to go naked into a nasty and completely empty concrete room" with "a hole in the floor" in which to defecate and urinate.  (S.P. Decl. ¶ 6.)  The room is "extremely cold" and "[t]hey leave you in there for days sometimes, naked and shivering."  (S.P. Decl. ¶ 6.)  The suicide cell's observation port is often smeared with feces from women who are mentally decompensating inside the cell.  (*See, e.g.*, Ex. B (Image 57).)  Not surprisingly, women may deny feeling suicidal simply to escape those harsh conditions.  (*See* B.W. Decl. ¶ 20 (describing suicide watch as "like being placed in a torture chamber" until you "say[] that you are not suicidal").)

K.H. likewise shows signs of severe distress related to isolated confinement. She "get[s] so depressed and anxious alone in [her] cell that [she] bang[s] [her] head against the wall." (K.H. Decl. ¶ 16.)[16]  Within three weeks of being placed in C-Pod, "her commode [was] noted with at least fifteen sandw[i]ches in it," her "room [was] messy," and K.H. herself appeared disheveled.  (K.H. Med. Records 2, 19 (Ex. C-2).)  In late January 2019—after nearly three months of solitary confinement in C-Pod—K.H. reported to a nurse that she was "stressed, depressed, [and] tired of being locked away."  (K.H. Med. Records 12.)  K.H. was placed on psychiatric observation for several days.  She told a mental health professional that she had been "locked up for weeks at a time with out getting a shower," so she "scratched [her] face up and started banging [her] head to get out of that place." (K.H. Med. Records 43.)  The mental health professional described K.H. as "delusional" and "talking to her self."  (*Id.*)  Around a week later, K.H. "had smeared feces throughout her cell and was observed 'talking to' the feces on her hands."  (K.H. Med. Records 54.)  When asked to take a shower, K.H. "went to the shower fully clothed and started bathing."  (*Id.*)  A mental health professional

---

[16] In addition to being isolated, K.H. lives in a cell that routinely floods with toilet water.  (K.H. Decl. ¶¶ 9-14.)  On several occasions, K.H. has felt compelled to use her bedding to clean up the water, leaving her with no bedding to sleep on.  (K.H. Decl. ¶ 11.)

evaluated K.H. and found her "responsive to internal stimuli, delusional, impulsive, [and] unkempt." (*Id.*)

Many other women are suffering from the effects of isolation. A substantial number of the women "have obvious mental difficulties that make it difficult for them to care for or advocate for themselves." (B.W. Decl. ¶ 4; A.R. Decl. ¶¶ 5-6.) These women "sit in their cells and talk to themselves all day," "pour[] urine out of [a] tray flap," and "smear and play with their feces." (A.R. Decl. ¶¶ 5-6 ("The odor in the living areas can be overwhelming, nauseating, and disgusting. In the past, I've had to scrub feces off a cell wall that had been left there by the cell's previous occupant.").)

For example, one woman, T.A., was "healthy and mostly coherent" when she entered solitary confinement late last year, but "[s]he has become progressively less stable and more incoherent, to the point that she says little that make sense." (B.W. Decl. ¶ 17.) Now, officers resort to dragging T.A.—who is in her mid-fifties, has difficulty walking, and wears an adult diaper—across the floor to return her to her isolation cell. (*Id.*)[17]

---

[17] T.A. was arrested for misdemeanor criminal trespass and is in jail because she cannot pay a $1,000 bond for her release.

Another woman, S.P., has experienced schizophrenia since age ten.  (S.P. Decl. ¶ 4.)  During her first month in the jail, she was assigned to general population in A-Pod.  (S.P. Decl. ¶ 5.)  She was moved to B-Pod after reporting that she was feeling suicidal.  (S.P. Decl. ¶ 6.)  She has remained in the "mental health pods" since then and is presently in G-Pod.  (S.P. Decl. ¶ 7.)  S.P. has "had a very difficult time coping in the mental health pods."  (S.P. Decl. ¶ 14.)  She has "been placed on suicide watch about every week to two weeks."  (S.P. Decl. ¶ 14; *see also* S.P. Med. Records (Ex. C-4).)[18]  She notes that "there is nothing to do" in the mental health pods and that it "would make a big difference" if she had activities and fresh air.  (S.P. Decl. ¶¶ 9, 15-16.)

---

[18]  To take a few examples, on February 28, 2019, S.P. was placed on suicide watch for five days after presenting as "Disheveled," "Poorly groomed," and "Unkempt," and voicing suicidal ideation.  Case notes during this time describe S.P. as variously living in a cell with "feces and blood all over floor, door and walls," "lying on [the] floor covered up with a blanket," "sitting on the floor yelling at times," and in a flooded cell "standing at cell door rubbing soap all over her body."  (S.P. Med. Records 3-4, 56.)  On March 10, she was placed on suicide watch for one day after reportedly voicing suicidal ideation.  (*Id.* at 14.)  On March 12, she was placed on suicide watch for three days after attempting to hang herself with a torn pair of panties; case notes during this time reflect S.P. repeatedly lying on the floor of her cell and smearing feces on her cell.  (*Id.* at 2, 13, 54.)  On March 16, S.P. was placed on suicide watch for three days after again attempting to hang herself.  (*Id.* at 2.)  In addition, Plaintiffs' counsel have been informed by jail staff that on or around March 26, S.P. was placed on suicide watch for two weeks, after which she was returned to her G Pod isolation cell.  Plaintiffs' counsel have further been informed by jail staff that S.P. has been placed on suicide watch at least twice in the past three weeks.

B.W., who has been diagnosed with major depressive disorder and post-traumatic stress disorder, describes similar experiences in G-Pod and B-Pod. (B.W. Decl. ¶¶ 3-27.)  She notes that some women experience severe psychiatric disabilities that lead them to "act out in ways that affect the entire pod," such as by smearing feces in their cells.  (B.W. Decl. ¶ 13.)  "In a small, confined space like a jail cellblock . . . , when one person's cell smells like feces, urine, or human decay, everyone else smells it in their cells.  You cannot get out and cannot get away from it no matter how badly you want to.  You feel completely helpless."  (B.W. Decl. ¶ 14.)  Because "some of the women in the mental health pods engage in irrational or bizarre acts such as defecating in the showers," B.W. has taken to bathing in her sink so that she does not have to "step in human feces and other kinds of filth."  (B.W. Decl. ¶ 15.)  B.W. has become depressed and suicidal during her past four months in solitary confinement.  (B.W. Decl. ¶¶ 20-23.)  She was placed on suicide watch in January 2019 and again in February 2019.  (B.W. Decl. ¶¶ 20-21; *see also* B.W. Med. Records 20-25 (Ex. C-5).)  In March 2019, she attempted to hang herself with a sheet.  (B.W. Decl. ¶¶ 22-24.)[19]

---

[19] Defendants' logbooks reflect other instances of deterioration among women in the mental health pods.  For example, on February 23, 2019, B-Pod detainee H.K. was observed "having a mental breakdown" and "banging her head on the wall."  (West Wing Logbook, Feb. 23, 2019, 1312 hours (Ex. F-4).)

Although B-Pod, C-Pod, and G-Pod hold only 30 cells total, with most women in the cells held alone (B.W. Decl. ¶ 6), all women who experience psychiatric disabilities in the South Fulton Jail—over 100 by most estimates—are at risk of being assigned to solitary confinement in those pods.  For example, "[a]n officer made the decision" to move C.O. from D-Pod to B-Pod on the morning of April 2, 2019, apparently because C.O. was "feeling jittery and anxious" and was "displaying symptoms of mental illness."  (C.O. Decl. ¶ 6.)

## B. Solitary Confinement Causes Serious Psychological Harm to People Who Experience Psychiatric Disabilities.

The psychiatric deterioration experienced by M.J., K.H., and other women is a predictable consequence of their forced isolation.  The segregated conditions in B-Pod, C-Pod, and G-Pod constitute solitary confinement, which has been defined as involuntary confinement in a cell for an average of 22 hours or more per day without meaningful human contact.[20]  As this definition makes clear, the touchstone of solitary confinement is the denial of "meaningful" human contact.

---

[20] *See, e.g.*, United Nations Standard Minimum Rules for the Treatment of Prisoners, Rule 44 (2015); Craig Haney, *The Social Psychology of Isolation: Why Solitary Confinement Is Psychologically Harmful*, 181 Prison Serv. J. 12, 12 n.1 (2009).

Confinement to an isolation cell can accordingly qualify as solitary confinement regardless of whether a detainee is housed alone or with others.[21]

There is an extensive body of research consistently showing that solitary confinement causes serious psychological harm.  "[S]cientists from diverse disciplinary backgrounds, working independently and across several continents, and over many decades, have reached almost identical conclusions about the negative effects of isolation in general and solitary confinement in particular."[22] Indeed, "[n]early every scientific inquiry into the effects of solitary confinement over the past 150 years has concluded that subjecting an individual to more than 10 days of involuntary segregation results in a distinct set of emotional, cognitive, social, and physical pathologies."[23]

---

[21] Some of the scientific literature and professional standards concerning isolated confinement and its effects use terms like "segregation" or "restrictive housing" interchangeably to describe the same phenomenon that Plaintiffs refer to as "solitary confinement."  *See, e.g.*, Am. College of Corr. Physicians, *Position Statement: Restrictive Housing of Mentally Ill Inmates* (July 9, 2013) ("Restricted housing, or solitary confinement, for the purposes of this position statement, refers to confinement in the cell with markedly reduced out-of-cell (programming or yard) time, and marked reduction in privileges and activities.  Inmates in restricted housing are generally locked in their cells for 23 hours per day or more.  Correctional systems vary regarding the use of single or double cells in these units.").

[22] Craig Haney, *The Psychological Effects of Solitary Confinement: A Systematic Critique*, 47 Crime & Justice 365, 367 (2018).

[23] David H. Cloud, *et al.*, *Public Health and Solitary Confinement in the United States*, 105 Am. J. of Pub. Health 18, 21 (2015).

When isolated from others, even people who do not experience psychiatric disabilities exhibit pathological adaptations to cope with isolation.[24]  The consequences of these changes can be dire.  For example, rates of self-injury are far higher in solitary confinement units than in the general jail population.  Researchers in one study found that people in solitary confinement were seven times more likely to commit acts of self-harm.[25]  In addition, researchers have observed certain types of behavior—such as spreading feces and setting fires—that seem to "occur exclusively" among people in solitary confinement.[26]  Dr. Craig Haney, a psychologist, has described similar findings:

> [F]or some prisoners . . . , solitary confinement precipitates a descent into madness.  Some isolated prisoners smear themselves with feces, sit catatonic in puddles of their own urine, or shriek wildly and bang their fists or heads against the walls that contain them.
>
> In some cases, the reactions are even more tragic and bizarre, including grotesque forms of self-harm and mutilation.  Prisoners have amputated parts of their own bodies or inserted tubes and other objects into their penises

---

[24] Craig Haney, *Mental Health Issues in Long-Term Solitary and 'Supermax' Confinement*, 49 Crime & Delinquency 124, 130-31 (2003).

[25] Fatos Kaba et al., *Solitary Confinement and Risk of Self-Harm Among Jail Inmates*, 104 Am. J. Pub. Health 442, 445-46 (2014).

[26] *Id.* at 446.

in acts that unfortunately can be met with an institutional matter-of-factness that is equally disturbing.[27]

"The adverse effects of solitary confinement are especially significant" for people who experience psychiatric disabilities.[28]  "All too frequently, mentally ill prisoners decompensate in isolation, requiring crisis care or psychiatric hospitalization."[29]  "Many [people experiencing psychiatric disabilities] simply will not get better as long as they are isolated."[30]

Accordingly, many health organizations have recognized that people experiencing psychiatric disabilities should rarely if ever be held in isolation, even of short duration.  The American Public Health Association's guidance states flatly, "Prisoners with serious mental illnesses should be excluded from placement in solitary confinement."[31]  The National Commission on Correctional Health Care has taken the same position, warning that people experiencing psychiatric

---

[27] *Reassessing Solitary Confinement: Hearing Before the Subcomm. on the Constitution, Civil Rights, and Human Rights of the S. Comm. on the Judiciary*, 112th Cong. 21 (2012) (statement of Craig Haney, Professor of Psychology, University of California, Santa Cruz).

[28] Jeffrey Metzner et al., *Solitary Confinement and Mental Illness in U.S. Prisons: A Challenge for Medical Ethics*, 38 J. Am. Acad. Psych. & L. 104, 104-05 (2010).

[29] *Id.* at 105.

[30] *Id.*

[31] Am. Pub. Health Ass'n, Policy No. 201310, *Solitary Confinement as a Public Health Issue* (2013).

20

disabilities "should be excluded from solitary confinement of any duration"[32]  The American Psychiatric Association has called for eliminating solitary confinement of seriously mentally ill people in most cases and providing both structured therapeutic activities and unstructured out-of-cell time on those "rare" occasions when mentally ill people are held in segregated housing.[33]  In the words of Dr. Jeffrey Metzner, a nationally recognized expert in correctional psychiatric care, "it is not ethically defensible" to lock seriously mentally ill patients in segregation where they are locked inside of their cells 23 to 24 hours every day.[34]

As described above, Plaintiffs M.J., K.H., and other women are currently experiencing the psychological harm caused by extended isolation.  Their suffering could be substantially reduced by a few straightforward changes to the living conditions in B-Pod, C-Pod, and G-Pod.  For example, women report that their living conditions would be significantly improved if they were provided increased time out of their cells, fresh air, and activities—conditions Defendants already provide to the jail's other pods.  (*See* B.W. Decl. ¶ 27; S.P. Decl. ¶¶ 15-16.)

---

[32] Nat'l Comm'n on Corr. Health Care, Position Statement, *Solitary Confinement (Isolation)* 4 (Apr. 2016).

[33] Am. Psych. Ass'n, Position Statement, *Segregation of Prisoners with Mental Illness* (2012).

[34] Metzner et al., *Solitary Confinement and Mental Illness in U.S. Prisons*, 38 J. Am. Acad. Psych. Law at 107.

# ARGUMENT

## I.   Plaintiffs Meet the Requirements for a Preliminary Injunction.

A court should grant a preliminary injunction where the movant establishes "(1) a substantial likelihood of success on the merits; (2) that irreparable injury will be suffered unless the injunction is issued; (3) the threatened injury to the moving party outweighs whatever damage the proposed injunction might cause the non-moving party; and (4) if issued, the injunction would not be adverse to the public interest." *Lebron v. Sec'y, Fla. Dep't of Children and Families*, 710 F.3d 1202, 1206 (11th Cir. 2013) (quoting *Keeton v. Anderson-Wiley*, 664 F.3d 865, 868 (11th Cir. 2013)).  As discussed below, each requirement is satisfied in this case.

### A.   Plaintiffs Likely Will Succeed on the Merits of Their Challenge to the South Fulton Jail's Conditions of Confinement.

Plaintiffs claim that their prolonged solitary confinement violates the Eighth and Fourteenth Amendments (Doc. 1 ¶¶ 165-82), the Americans with Disabilities Act (*id.* ¶¶ 183-97), and the Rehabilitation Act (*id.*).  Plaintiffs are likely to prevail on these claims at trial.

#### 1.   Solitary confinement violates Plaintiffs' rights under the Eighth and Fourteenth Amendments.

Plaintiffs have a substantial likelihood of prevailing on their Eighth and Fourteenth Amendment claims challenging their solitary confinement.  The Eighth

22

and Fourteenth Amendments prohibit cruel and unusual punishments.  *See Thomas v. Bryant*, 614 F.3d 1288, 1303 (11th Cir. 2010) (quoting *Hudson v. McMillian*, 503 U.S. 1, 5 (1992)).  In the context of a challenge to a prison or jail's conditions of confinement, a plaintiff must satisfy two elements, one objective and the other subjective.  *Id.* at 1303-04.  Objectively, the evidence must show "a deprivation or injury that is 'sufficiently serious' to constitute a denial of the 'minimal civilized measure of life's necessities.'"  *Thomas*, 614 F.3d at 1304 (quoting *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)).  The subjective standard is met when defendant prison officials have a "sufficiently culpable state of mind."  *Id.*

### a.   Solitary confinement presents a substantial risk of serious psychological harm.

Under the Eighth and Fourteenth Amendments, "[p]risoners retain the essence of human dignity inherent in all persons" and are, for that reason, entitled to living conditions that comport with contemporary standards of decency. *Brown v. Plata*, 563 U.S. 493, 510-11 (2011).  A jail that deviates from these requirements "is incompatible with the concept of human dignity and has no place in civilized society."  *Id.*  In particular, jailers may not deprive detainees of "basic needs."  *See LaMarca v. Turner*, 995 F.2d 1526, 1535 (11th Cir. 1993).  Basic human needs include obvious necessities like food and water, *see, e.g.*, *Canupp v. Paul*, 716 F. App'x 836, 840 (11th Cir. 2017), as well as conditions deemed by

23

society to be essential to human dignity, such as necessary medical care, *see, e.g.*, *Brown*, 563 U.S. at 510, and reasonable sanitation, *see, e.g.*, *Brooks v. Warden*, 800 F.3d 1295, 1303-04 (11th Cir. 2015).  Relatedly, the Constitution protects against conditions that pose "an objectively 'unreasonable risk of serious damage to [prisoners'] future health.'"  *Brooks*, 800 F.3d at 1303 (quoting *Chandler v. Crosby*, 379 F.3d 1278, 1289 (11th Cir. 2004)); *see also Helling v. McKinney*, 509 U.S. 25, 35 (1993).  In determining what constitutes a human need or an unreasonable risk of harm, the inquiry is "contextual" in that the concept of "cruel and unusual" punishment is "responsive to contemporary standards."  *Thomas*, 614 F.3d at 1304.  A practice once considered acceptable may become unconstitutional when used in a manner that imposes a deprivation or a risk of harm deemed unacceptable under contemporary standards.[35]

Solitary confinement violates Plaintiffs' Eighth and Fourteenth Amendment rights because it causes serious psychological harm to many inmates with serious mental illness.  *See Thomas*, 614 F.3d at 1313 (recognizing a "risk of psychological harm to inmates" can constitute an objectively serious deprivation).  Even detainees who do not experience psychiatric disabilities can experience that

---

[35] *See, e.g.*, *Hope v. Pelzer*, 536 U.S. 730, 738 (2002) (holding use of outdoor hitching post unconstitutional); *Thomas*, 614 F.3d at 1309 (holding use of chemical spray unconstitutional).

harm, as "[l]ong periods of lock up in a confined space, limited contact with others, continued and unexpected surveillance and limited exercise eventually take a serious toll on the mental health of the inmates." *Hardwick v. Ault*, 447 F. Supp. 116, 125 (M.D. Ga. 1978).

Those harmful effects are amplified when a person suffers serious mental illness. Placing such people in solitary confinement "is the mental equivalent of putting an asthmatic in a place with little air to breathe." *See Jones 'El v. Berge*, 164 F. Supp. 2d 1096, 1120 (W.D. Wisc. 2001) (quoting *Madrid v. Gomez*, 889 F. Supp. 1146, 1265 (N.D. Cal. 1995)). It is now well understood that people with serious mental illness often "decompensate in isolation, requiring crisis care or psychiatric hospitalization."[36] "Many simply *will not get better* as long as they are isolated."[37] Therefore, even when detainees with serious mental illness "legitimately need an extremely high level of security"—a doubtful proposition with respect to the women detained at the South Fulton Jail, many of whom are held for misdemeanors—those detainees should be offered "at least 10 to 15 hours per week of out-of-cell structured therapeutic activities in addition to at least

---

[36] Jeffrey Metzner et al., *Solitary Confinement and Mental Illness in U.S. Prisons: A Challenge for Medical Ethics*, 38 J. Am. Acad. Psych. & L. 104, 104-05 (2010).

[37] *Id.* at 105 (emphasis added).

another 10 hours per week of unstructured exercise or recreation time."[38]

Recognizing the consistent deterioration that people with serious mental illness suffer when held in isolation, federal courts have concluded that "placing seriously mentally ill prisoners in segregation amounts to denial of minimal care." *See, e.g.*, *Braggs v. Dunn*, 257 F. Supp. 3d 1171, 1246-47 (M.D. Ala. 2017) (concluding, and noting the agreement of correctional administrators, that "it is categorically inappropriate to place prisoners with serious mental illness in segregation absent extenuating circumstances"). In numerous decisions over the course of three decades, courts have acted to curb the practice of isolating people with psychiatric disabilities.[39]  Therefore, Plaintiffs have a substantial likelihood of proving that the conditions in which they are held pose a substantial risk of serious psychological harm to women with serious mental illness.

---

[38] Jeffrey Metzner et al., *An Overview of Correctional Psychiatry*, 29 Psych. Clin. N. Am. 761, 764 (2006).

[39] *See, e.g.*, *Graves v. Arpaio*, 48 F. Supp. 3d 1318, 1335-36 (D. Ariz. 2014); *Coleman v. Brown*, 28 F. Supp. 3d 1068, 1099 (E.D. Cal. 2014); *Indiana Protection and Advocacy Serv. Comm'n v. Comm'r, Indiana Dep't of Corr.*, No. 1:08-CV-1317, 2012 WL 6738517, at *15-17 (S.D. Ind. Dec. 31, 2012); *Jones El v. Berge*, 164 F. Supp. 2d 1096, 1119-23 (W.D. Wis. 2001); *Ruiz v. Johnson*, 37 F. Supp. 2d 855, 915 (S.D. Tex. 1999), *rev'd on other grounds*, 243 F.3d 941 (5th Cir. 2001); *Madrid v. Gomez*, 889 F. Supp. 1146, 1265 (N.D. Cal. 1995); *Casey v. Lewis*, 834 F. Supp. 1477, 1549-50 (D. Ariz. 1993); *Langley v. Coughlin*, 715 F. Supp. 522, 540 (S.D.N.Y. 1989).

**b.** **Defendants are aware of but have failed to respond reasonably to the risk of serious harm posed by their solitary confinement policies and practices.**

Plaintiffs are also likely to meet the subjective component of proving an Eighth and Fourteenth Amendment violation.  In a case challenging unconstitutional jail conditions, "the relevant state of mind for purposes of liability is deliberate indifference." *Thomas*, 614 F.3d at 1304.  A jail official is deliberately indifferent when the official has "subjective awareness of an 'objectively serious need'" and the official's conduct is "an objectively insufficient response to that need."  *See Farrow v. West*, 320 F.3d 1235, 1243 (11th Cir. 2003) (quoting *Taylor v. Adams*, 221 F.3d 1254, 1258 (11th Cir. 2000)).  Where, as here, jailers are sued in their official capacities for prospective relief, a federal court may consider an "institution's historical indifference" in determining whether officials had the requisite state of mind.  *See LaMarca*, 995 F.2d at 1542.

Defendants have imposed the same conditions in the South Fulton Jail for years.  Defendants' records evidence the mental health episodes, self-injurious behavior, and suicide attempts that result from prolonged confinement under those conditions.  (*See, e.g.*, Ex. C-1 at 8; Ex. D.)  Under these circumstances, the current risk of serious psychological harm is obvious to Defendants.  *See Thomas*, 614 F.3d at 1313.  Moreover, Defendants Jackson and Adger were notified of these

conditions in a detailed letter sent to them in August 2018.[40]  Defendants' response

has been "objectively insufficient," *see Farrow*, 320 F.3d at 1243 (quoting *Taylor*,

221 F.3d at 1258), in that they continue to hold people experiencing psychiatric

disabilities in solitary confinement.  Plaintiffs are therefore likely to prevail on the

merits of their claims under the Eighth and Fourteenth Amendments.

### 2. Solitary confinement violates Plaintiffs' rights under the Americans with Disabilities Act.

Plaintiffs also are likely to prevail on their claim that Defendants' solitary

confinement practices constitute unlawful disability discrimination.[41]  Under the

Americans with Disabilities Act, "no qualified individual with a disability shall, by

reason of such disability, be excluded from participation in or be denied the

benefits of the services, programs, or activities of a public entity, or be subjected to

discrimination by any such entity."  42 U.S.C. § 12132.  To establish a prima facie

---

[40] *See* Ltr. to Sheriff Jackson et al., Aug. 17, 2018 (Ex. G-1); Fulton Cty. Sheriff's Office, *Response to the AJC Concerning Inmates with Mental Illness*, Aug. 31, 2018, *available at* https://www.facebook.com/fultonsherif f/posts/1066626080185128?__tn__=K-R (last visited Apr. 17, 2019) (Ex. G-2).

[41] Plaintiffs raise disability discrimination claims under the Americans with Disabilities Act and the Rehabilitation Act.  Because "[d]iscrimination claims under the Rehabilitation Act are governed by the same standards used in ADA cases," *Cash v. Smith*, 231 F.3d 1301, 1305 (11th Cir. 2000), Plaintiffs' discussion below of why they are likely to prevail on their ADA claims applies with equal force to their Rehabilitation Act claims, which are not separately discussed in this brief.

ADA claim, "a plaintiff generally must prove (1) that [she or] he is a qualified individual with a disability; (2) that [she or] he was either excluded from participation in or denied the benefits of a public entity's services, programs, or activities, or was otherwise discriminated against by the public entity; and (3) that the exclusion, denial of benefit, or discrimination was by reason of the plaintiff's disability." *Bircoll v. Miami-Dade Cty.*, 480 F.3d 1072, 1083 (11th Cir. 2007).

Plaintiffs M.J. and K.H., as well as GAO's other constituents in Defendants' custody, plainly have disabilities that substantially limit one or more of their major life activities. *See* 42 U.S.C. § 12102(1). And jails "fall squarely within the statutory definition of 'public entity,' which includes 'any department, agency, special purpose district, or other instrumentality of a State or States or local government.'" *See Pa. Dep't of Corr. v. Yeskey*, 524 U.S. 206, 210 (1998) (quoting 42 U.S.C. § 12131 (1)(b)) (holding ADA applies to state prisons).

As Fulton County Jail system detainees, Plaintiffs ordinarily would be deemed "qualified" to receive several hours per day of out of cell time and access to out-of-cell activities because being a person confined in one of Defendants' jails is the "essential eligibility requirement[]" for these programs and services. *See* 42 U.S.C. § 12131(2). *See generally Yeskey*, 524 U.S. at 210 (noting prisons "provide inmates with many recreational 'activities,' medical 'services,' and educational and

29

vocational 'programs'" potentially covered by the ADA).  Defendants deny those

programs and services to M.J., K.H., and other women with psychiatric

disabilities—instead confining them to isolation cells—solely because of their

disabilities.  While held in isolation cells, the women in Defendants' custody are

denied access to beneficial programs and services, and this deprivation is

compounded by the predictable decline in mental functioning that results from

prolonged solitary confinement of people who experience psychiatric disabilities.

To the extent that Defendants segregate these women for legitimate

administrative reasons, there are reasonable modifications that would allow

Plaintiffs and others access to the programs and services Defendants offer other

people in the South Fulton Jail.  In particular, Defendants could offer regular out-

of-cell time and activities to women with psychiatric disabilities by affording them

"clinical settings where patients would not be locked in isolation, but would

instead participate in a comprehensive schedule of therapeutic activities."[42]  The

cost of staffing such programs "may be offset by reductions in injury,

---

[42] *See* Sarah Glowa-Kollisch et al., *From Punishment to Treatment: The 'Clinical Alternative to Punitive Segregation' (CAPS) Program in New York City Jails*, 13 Int'l J. Environ. Res. & Pub. Health 182 (2016) (noting that therapeutic activities can include "psychotherapy, creative art, nursing education groups, individual mental health and medical encounters and community meetings").

hospitalization and litigation" relative to holding people with psychiatric disabilities in long-term solitary confinement units, where they predictably deteriorate.[43]

Moreover, as reflected in their contract with NaphCare, Inc.—the designated mental health services provider for the South Fulton Jail—Defendants themselves recognize the importance and reasonableness of appropriate "individual or group therapy as indicated, to relieve symptoms, achieve a level of appropriate functioning and prevent a relapse."[44]  Likewise, Defendants' own policies provide that people who experience psychiatric disabilities must be held in "non-acute mental health residential units" that have "[p]rogramming or therapies as needed," a "sufficient number of mental health staff," appropriate "training for correctional officers assigned to the unit," and "[h]ousing in a clean and safe environment,

---

[43] *See id.*; *see also* Jeffrey Metzner, *Class Action Litigation in Correctional Psychiatry*, 30 J. Am. Acad. Psych. & L. 19, 26 (2002) (noting "correctional staff in [a solitary confinement facility that fails to provide an adequate residential treatment program] has to deal with more behavioral management problems, with a subsequent increase in staff injuries and decrease in staff morale").

[44] Fulton Cty. Gov't, Contract No. 17RFP07012016B-BR, *Inmate Medical Services for Sheriff's Dep't* 63 (Jan. 1, 2018) (Ex. J).

including facilities necessary for maintaining personal hygiene and guidance for [activities of daily living], if necessary."[45]

For these reasons, Plaintiffs have a substantial likelihood of prevailing on their claim that Defendants' policy of isolating people who experience psychiatric disabilities violates the Americans with Disabilities Act.

### B. Plaintiffs Will Suffer Irreparable Harm If They Remain in Solitary Confinement.

Plaintiffs will suffer irreparable harm if this Court does not intervene because the violations of their rights "'cannot be undone through monetary remedies.'" *Scott v. Roberts*, 612 F.3d 1279, 1295 (11th Cir. 2010) (quoting *Cunningham v. Adams*, 808 F.2d 815, 821 (11th Cir. 1987)). Absent an injunction, Plaintiffs will continue to be subjected to cruel and unusual punishment. *See Thomas*, 614 F.3d at 1322 ("No remedy at law will provide protection for [a prisoner] from [his] unconstitutional condition of confinement in the future."). The severe restrictions that B-Pod, C-Pod, and G-Pod place on human interaction also create a risk of permanent harm to Plaintiffs' physical and mental health. *See, e.g.*, *Braggs v. Dunn*, 257 F. Supp. 3d 1171, 1246-47 (M.D. Ala. 2017). Numerous psychotic episodes, suicide attempts, and acts of self-injury are documented in the

---

[45] NaphCare Policy No. J-F-03, *Mental Health Services—Mental Health Programs and Residential Units* (Nov. 2018) (Ex. I-6).

attached exhibits.  As starkly illustrated by the case of Kesha Brownlee, who died

as a result of ingesting plastic items after being isolated for months inside a trash-

strewn G-Pod cell (Ex. D), the psychological harm fostered by Defendants'

policies and practices can have tragic and irreversible consequences for detainees

and their families.  Therefore, Plaintiffs have established an irreparable injury.  *See*

*Thomas*, 614 F.3d at 1321 ("[The defendants'] historical treatment of [seriously

mentally ill prisoner-plaintiff] gives rise to an inference of future irreparable injury

justifying the entry of injunctive relief.").

###    C.    The Harm Caused by Keeping Plaintiffs in Solitary Confinement Exceeds the Harm That an Injunction Would Cause Defendants.

The significant harm to Plaintiffs far exceeds any harm Defendants will

suffer if the injunction issues.  *See Odebrecht Const., Inc. v. Sec'y, Fla. Dep't of

Transp.*, 715 F.3d 1268, 1290 (11th Cir. 2013).  Defendants themselves recognize

the importance of providing therapeutic services "to relieve symptoms, achieve a

level of appropriate functioning and prevent a relapse,"[46] and their own policies

provide for offering people with psychiatric disabilities "[p]rogramming or

---

[46] Fulton Cty. Gov't, Contract No. 17RFP07012016B-BR, *Inmate Medical Services for Sheriff's Dep't* 63 (Jan. 1, 2018) (Ex. J).

therapies" and "[h]ousing in a clean and safe environment."[47]  Indeed, Defendants

provide these services to the men in their custody.  Requiring the South Fulton Jail

to implement these necessary practices for the incarcerated women will

significantly improve the lives of Plaintiffs and other women without unduly

burdening Defendants.

### D.     A Preliminary Injunction Will Serve the Public Interest.

Public interest considerations favor the proposed injunction because

enjoining a government official's unconstitutional conduct does not infringe on

any legitimate public interest.  *See Odebrecht Const., Inc.*, 715 F.3d at 1290.

Rather, "it is always in the public interest to prevent the violation of a party's

constitutional rights."  *G & V Lounge v. Mich. Liquor Control Comm'n*, 23 F.3d

1071, 1079 (6th Cir. 1994).

## II.    The Court Should Enter a Preliminary Injunction, Order Expedited Discovery, Hold an Evidentiary Hearing Within 90 Days, and Find That the Relief Ordered Satisfies the Prison Litigation Reform Act (PLRA).

The Prison Litigation Reform Act (PLRA) provides that preliminary

injunctive relief "must be narrowly drawn, extend no further than necessary to

correct the harm the court finds requires preliminary relief, and be the least

---

[47] NaphCare Policy No. J-F-03, *Mental Health Services—Mental Health Programs and Residential Units* (Nov. 2018) (Ex. I-6).

intrusive means necessary to correct that harm."  18 U.S.C. § 3626(a)(2); *see*

*Cason v. Seckinger*, 231 F.3d 777, 784 (11th Cir. 2000).  A district court must

make written findings that the preliminary injunctive relief ordered satisfies these

requirements, which some courts refer to as "need–narrowness–intrusiveness

findings."  *United States v. Secretary, Fla. Dep't of Corr.*, 778 F.3d 1223, 1228-29

(11th Cir. 2015).  When there is a dispute over whether these requirements are met,

a district court must provide the plaintiffs an "opportunity to present evidence on

that point."  *See Loyd v. Ala. Dep't of Corr.*, 176 F.3d 1336, 1342 (11th Cir. 1999).

Recognizing that the findings required by § 3626(a)(2) should be made on

an appropriate factual record, Congress provided in the PLRA a safe-harbor

provision that permits a district court to enter a preliminary injunction and defer

making those findings for up to 90 days.  *See* 18 U.S.C. § 3626(a)(2) ("Preliminary

injunctive relief shall automatically expire on the date that is 90 days after its entry,

unless the court makes the findings required under subsection (a)(1) for the entry

of prospective relief and makes the order final before the expiration of the 90-day

period."); *see United States v. Secretary*, 778 F.3d at 1227 (explaining that a

district court must make the required findings and enter a final order "to keep a

preliminary injunction alive past the 90-day deadline").

In accordance with § 3626(a)(2), Plaintiffs respectfully ask that the Court enter the requested preliminary injunction, allow Plaintiffs expedited discovery, and hold a hearing within 90 days at which Plaintiffs can present evidence showing that the requested preliminary injunctive relief meets the PLRA's need–narrowness–intrusiveness requirements.  The requested relief—that Defendants provide four hours per day of out-of-cell time and formulate their own plan for providing appropriate therapeutic activities to people experiencing psychiatric disabilities—is likely to satisfy § 3626(a)(2).  *See Thomas v. Bryant*, 614 F.3d 1288, 1323 n.33 (11th Cir. 2010) (approving of district court soliciting prison officials' proposals for injunctive relief, as those officials were "in the best position to suggest the least intrusive means of remedying the constitutional violation").

## CONCLUSION

The Court should enter a preliminary injunction ordering Defendants to:

(1)   Offer at least four hours of daily out-of-cell time to all women in B-Pod, C-Pod, and G-Pod, including one hour per day of outdoor time; and

(2)   Within 30 days, establish and present to the Court for its approval a plan, designed to be implemented within another 30 days, for providing a medically appropriate environment for women who experience psychiatric disabilities and are assigned to B-Pod, C-Pod, and G-Pod, including sanitary conditions of confinement and out-of-cell therapeutic activities.

Respectfully submitted,

/s/ Ryan Primerano

Devon Orland
Ga. Bar No. 554301
Anne Kuhns
Ga. Bar No. 149200
GEORGIA ADVOCACY OFFICE
1 West Court Square
Suite 625
Decatur, Georgia 30030
(404) 885-1234
(404) 378-0031 (fax)
dorland@thegao.org

Sarah Geraghty
Ga. Bar No. 291393
Aaron Littman
Ga. Bar No. 843053
Ryan Primerano
Ga. Bar No. 404962
SOUTHERN CENTER
FOR HUMAN RIGHTS
83 Poplar Street, NW
Atlanta, Georgia 30303
(404) 688-1202
(404) 688-9440 (fax)
sgeraghty@schr.org

*Counsel for Plaintiffs*

May 7, 2019

37

## CERTIFICATE OF COMPLIANCE

I certify that this document has been prepared in compliance with Local

Rule 5.1C using 14-point Times New Roman font.

/s/ Ryan Primerano

May 7, 2019