# INVESTIGATION OF THE HAMPTON ROADS REGIONAL JAIL (PORTSMOUTH, VIRGINIA)



United States Department of Justice
Civil Rights Division

United States Attorney's Office
Eastern District of Virginia

December 19, 2018

# TABLE OF CONTENTS

I.  SUMMARY ................................................................................................................ 1
II.  INVESTIGATION .................................................................................................... 2
III.  BACKGROUND ....................................................................................................... 3
IV.  CONDITIONS IDENTIFIED ................................................................................... 7

A.  Medical Care at the Hampton Roads Regional Jail is Inadequate in Violation of Prisoners' Constitutional Rights ......................................................................... 8

    1.  Prisoners at the Jail have Serious Medical Needs Requiring Treatment .... 9
    2.  Prisoners are Subjected to a Substantial Risk of Serious Harm as a Result of Inadequate Medical Care ............................................................................. 9
    3.  Inadequate Staffing and Inadequate Monitoring and Oversight Contribute to Inadequate Medical Care .......................................................................... 15
    4.  Officials at the Jail Knew of the Risk to Prisoner Health and Safety Posed by Inadequate Medical Care and Disregarded It ....................................... 17

B.  Mental Health Care at the Jail is Inadequate in Violation of Prisoners' Constitutional Rights ......................................................................................... 17

    1.  Prisoners at the Jail have Serious Mental Health Needs Requiring Treatment ...................................................................................................... 17
    2.  Prisoners are Subjected to a Substantial Risk of Serious Harm as a Result of Inadequate Mental Health Care ............................................................. 18
    3.  Inadequate Staffing and Poor Facility Design Contribute to Inadequate Mental Health Care ...................................................................................... 23
    4.  Officials at the Jail Knew of the Risk to Prisoner Health and Safety Posed by Inadequate Mental Health Care and Disregarded It ............................. 26

C.  The Jail's Use of Prolonged Restrictive Housing Under Current Conditions, Including the Failure to Provide Adequate Medical and Mental Health Care, Violates the Constitutional Rights of Prisoners with Serious Mental Illness ....... 27

    1.  Prisoners with Serious Mental Illness Are Subjected to a Substantial Risk of Serious Harm as a Result of the Jail's Use of Prolonged Restrictive Housing ........................................................................................................ 27
    2.  Prisoners with Serious Mental Illness Have Suffered Serious Harm as a Result of the Jail's Use of Restrictive Housing Under Current Conditions ................................................................................................... 33
    3.  Officials at the Jail Knew of the Substantial Risk of Serious Harm and Disregarded It .............................................................................................. 36

D.  The Jail's Use of Restrictive Housing on Prisoners with Mental Health Disabilities Violates the Americans with Disabilities Act .................................. 36

V.  MINIMUM REMEDIAL MEASURES .................................................................. 39
VI.  CONCLUSION ....................................................................................................... 43

# I. SUMMARY

After an extensive investigation, the United States Department of Justice provides notice, pursuant to the Civil Rights of Institutionalized Persons Act (CRIPA), 42 U.S.C. § 1997b, and the Americans with Disabilities Act (ADA), 42 U.S.C. § 12132, that there is reasonable cause to believe, based on the totality of the conditions, practices, and incidents discovered there, that: (1) the conditions at the Hampton Roads Regional Jail violate the Eighth and Fourteenth Amendments of the Constitution; (2) these violations are pursuant to a pattern or practice of resistance to the full enjoyment of rights protected by the Eighth and Fourteenth Amendments; and (3) the conditions at the Hampton Roads Regional Jail violate the ADA.  The Department does not serve as a tribunal authorized to make factual findings and legal conclusions binding on, or admissible in, any court, and nothing in this Notice should be construed as such.  Accordingly, this Notice is not intended to be admissible evidence and does not create any legal rights or obligations.

Specifically, the United States provides notice of the following identified conditions:

- **The Jail fails to provide constitutionally adequate medical care to prisoners.**  Many prisoners at the Jail have serious medical needs requiring treatment, and these prisoners are placed at a substantial risk of serious harm when they do not receive adequate treatment.  The Jail fails to provide adequate intake, discharge planning, sick call, chronic care, and emergency care such that prisoners are subjected to an unacceptable risk of harm due to delays or lack of treatment.

- **The Jail fails to provide constitutionally adequate mental health care to prisoners.**  The Jail's mental health program lacks many of the hallmarks of a constitutionally adequate system.  Specifically, the Jail's current program fails to:  properly screen prisoners for mental illness; provide adequate treatment planning; adequately administer medications and psychotherapy; and properly treat and supervise suicidal prisoners.

- **The Jail's use of prolonged restrictive housing under current conditions, including the failure to provide adequate medical and mental health care, violates the constitutional rights of prisoners with serious mental illness.**  The Jail subjects prisoners with serious mental illness to prolonged periods of restrictive housing under conditions that place them at a substantial risk of serious harm.  During the first six months of 2017, an average of 70 prisoners with serious mental illness were held in restrictive housing on any given day.  Of the almost 500 prisoners the Jail identified as having serious mental illness between July 2016 and July 2017, more than 175 of them spent at least 30 consecutive days in restrictive housing.  More than 60 prisoners with serious mental illness spent three consecutive months or more in restrictive housing.  The majority of "suicide threat" and "self-inflicted injury" incidents occur in the Jail's restrictive housing cells.  Though only 15% of the Jail's population is housed in restrictive housing, between 2014 and August 2017, 60% of both the approximately 400 suicide threat incidents and the nearly 300 self-inflicted injury incidents occurred in a restrictive housing cell.  Also, of the 300 transfers from the Jail to a state-run psychiatric

hospital between 2016 and August 2017, 60% had been housed in restrictive housing immediately prior to being transferred to the state hospital.  Eighty-seven of those transfers occurred after a prisoner had spent 30 consecutive days or more in restrictive housing.

- **The Jail's restrictive housing practices discriminate against prisoners with mental health disabilities in violation of the ADA.**  The Jail places prisoners with mental health disabilities in restrictive housing on administrative status specifically because they are "mentally deficient," with no disciplinary or other reason given.  By placing these prisoners in restrictive housing because of their disability and denying them the benefits of the Jail's services, programs, and activities when they would otherwise be qualified to access these benefits in non-restrictive housing, the Jail violates the ADA.

## II.  INVESTIGATION

On December 12, 2016, the Department of Justice notified the Hampton Roads Regional Jail of our intent to conduct an investigation of the Jail pursuant to CRIPA and the ADA.  Our investigation focused on whether there is reasonable cause to believe the Jail (1) violates prisoners' rights to adequate medical and mental health care, (2) violates the constitutional rights of prisoners who have mental illness by secluding them in restrictive housing for prolonged time periods under current conditions, and (3) violates the ADA rights of prisoners who have mental health disabilities by denying them access to services, programs, and activities because of their disabilities.

The investigation was conducted jointly by the Special Litigation Section of the Department of Justice Civil Rights Division and the U.S. Attorney's Office for the Eastern District of Virginia.  Four nationally recognized expert consultants in correctional security and medical and mental health care assisted with our investigation.  Our experts included a former high-ranking corrections official with significant experience leading local corrections departments and a medical doctor with experience running the medical department in one of the country's largest jails.  These experts accompanied us on site visits to the Jail, community services boards (CSBs), local mental health courts, and crisis drop-off centers.  Our experts interviewed Jail staff and prisoners, reviewed documents, and provided their expert opinions and insight to help inform our investigation and its conclusions.

Between December 2016 and October 2017, representatives from the Department of Justice and our experts conducted four site visits to the Jail.  Over the course of our visits, we interviewed administrative staff, security staff, medical and mental health staff, and prisoners.  We also met with members of the community-based Forensic Advisory Team overseeing the Jail's mental health pilot program, which seeks to improve discharge planning and community coordination.  In addition to conducting tours and interviews, we reviewed an extensive number of documents, including policies and procedures for the Jail and the Jail's medical provider, medical and mental health records, cell assignment histories, incident reports, investigative reports, disciplinary reports, administrative audit reports, prisoner grievances, unit logs,

orientation materials, and training materials.[1]  We analyzed data from the Jail's security system, including, for example, data relating to length of stay in restrictive housing, Jail admission dates, and transfers to the state psychiatric hospital.  We observed prisoners in various settings throughout the facility, including in general population and restrictive housing units.  We conducted exit conferences with Jail officials upon the conclusion of our visits in order to provide technical assistance during the course of the investigation.

## III.  BACKGROUND

The Hampton Roads Regional Jail opened in 1998, and is located in Portsmouth, Virginia.  It serves five local jurisdictions:  Newport News, Hampton, Norfolk, Portsmouth, and Chesapeake, and is operated under the authority of a 15-member board made up of the sheriffs, city managers, and one council member from each of the five jurisdictions.  The facility is managed by a superintendent and an assistant superintendent.  The Jail is funded through contributions from each of the five jurisdictions as well as contributions from the Virginia Department of Corrections for each state-sponsored prisoner held at the facility and from the Virginia Compensation Board to cover part of the salaries of security staff.  For fiscal year 2017, the Jail's operating budget was $39 million, of which $9 million was spent on medical and mental health services.

Each of the five jurisdictions operates its own local jail and selects which prisoners are sent to the Regional Jail.  The Jail was originally built to address local jail overcrowding in the five jurisdictions it serves.  Over time, however, the local jurisdictions have tended to transfer to the Jail prisoners with significant mental health or medical needs, prisoners unable to follow directions in a correctional setting, and prisoners accused of committing high-profile crimes.  Some jurisdictions even send all of their female prisoners to the Jail.  The result of such a system is that the Jail has an especially concentrated high-needs population.  During our investigation, the makeup of the Jail's population has remained relatively constant.  At any given time, the Jail houses approximately 1,100 prisoners, of which approximately 600 are pretrial detainees and approximately 500 are already sentenced.  Of the overall Jail population, about 750 are on the medical chronic care list at any given time, including an average of 66 prisoners with HIV, 134 with an infectious disease, and 24 who are pregnant.

The Jail also houses a high proportion of individuals with serious mental illness, many of whom are repeatedly admitted for minor offenses, at significant expense.  Approximately half of the Jail's population is taking some type of psychotropic medication and a quarter have been diagnosed with a serious mental illness.  In response to a statewide survey required by the Virginia General Assembly, the Jail reported that 47% of the 279 prisoners with serious mental illness who were housed at the Jail during the month of June 2017 had non-violent or

---

[1] In this investigation, we include examples of incidents and the experiences of particular individuals to illustrate the patterns.  When prisoners described problems concerning their medical or mental health care or placement in restrictive housing, we verified those issues with documents and data provided by the Jail.  For each example, we based our conclusion on the Jail's own documents and data.

3

misdemeanor drug charges as their most serious offense.  Of the 496 prisoners the Jail identified as having serious mental illness between July 2016 and July 2017, we identified 62 whose entire booking history at the Jail included only minor offenses such as shoplifting, trespassing, or probation violations.  In total, as of August 31, 2017, these 62 individuals had spent 17,373 days at the Jail.  During Virginia's fiscal year 2017 alone, these prisoners spent 8,030 days in the Jail, which cost the local communities at least $505,890.[2]  In addition, if prisoners decompensate in the Jail, the Jail transfers them to a state psychiatric hospital that costs the Commonwealth an average of $298 per patient, per day.  In 2016, there were 169 such transfers to a state psychiatric hospital, and during the first eight months of 2017, there were 132.

The Jail houses prisoners with serious medical and mental health needs throughout its three housing units, which are each divided into pods.  The male prisoners with the most acute medical needs are held in one pod with 56 beds, and the male prisoners with the most acute mental health needs are held in another pod with 69 beds.  There is a nurse or nursing assistant on duty at all times outside of these two pods.  The other two pods in this housing unit are restrictive housing units and have 96 beds.  Other male prisoners with serious mental health needs are held in a mental health "step-down" pod in a different housing unit.  There are no special pods set aside for female prisoners with special medical or mental health needs.

Since December 2015, medical and mental health services at the Jail have been provided by a private medical care provider, Correct Care Solutions (CCS).  Four of the five feeder jails also contract with CCS and use the same electronic medical system.

At the time of our March 2017 visit, approximately 230 prisoners were in restrictive housing.  For purposes of this Notice, the term "restrictive housing" means the state of being confined to one's cell for the vast majority of the day, typically 22 hours or more, alone or with other prisoners.[3]  At the Jail, prisoners held in restrictive housing are allowed one hour of recreation out of their cells Monday through Friday and are allowed to shower three times per

---

[2] This figure is the based on a $63 average cost per day to the communities, but the actual cost is likely higher because of the costs associated with treating these prisoners' serious mental health needs.  This cost does not include funding received from other sources, such as the Virginia Compensation Board, which pays for a portion of the correctional officers' salaries.  Notably, $63 is more expensive than the most intensive evidence-based community mental health services, which do not include housing costs and are estimated to cost $45.21 per day.

[3] Restrictive housing, elsewhere sometimes referred to as solitary confinement, segregation, or isolation, is any type of detention that involves three basic elements: removal from the general prisoner population, whether voluntary or involuntary; placement in a locked room or cell, whether alone or with another prisoner; and inability to leave the room or cell for the vast majority of the day, typically 22 hours or more.  *Porter v. Clarke*, 290 F. Supp. 2d 518, 528 (E.D. Va. 2018) (citing U.S. Dep't of Justice, Report and Recommendations Concerning the Use of Restrictive Housing 3 (Jan. 2016) [hereinafter Restrictive Housing Report]).  The Jail itself uses the term restrictive housing for this type of detention.  Courts have referred to various durations when describing this type of detention.  *See, e.g.*, *Wilkinson v. Austin*, 545 U.S. 209, 214, 223-24 (2005) (describing restrictive housing as limiting human contact for 23 hours per day); *Sweet v. S.C. Dep't of Corr.*, 529 F.2d 854, 867 (4th Cir. 1975) (Butzner, J., concurring) (describing restrictive housing as being alone in a cell for 24 hours per day, save for two, one-hour periods a week for exercise and a shower); *Tillery v. Owens*, 907 F.2d 418, 422 (3d Cir. 1990) (21 to 22 hours per day).

week.  Prisoners in restrictive housing are locked down for the entire 24 hours on Saturday and
Sunday.

We were prompted to conduct an investigation of the Jail's treatment of prisoners in the
wake of tragic deaths that captured local and national attention, including those of AA[4] in August
2015 and BB in August 2016, and pursuant to a complaint received by the Department.  The first
death, which received the most attention, was that of 24-year-old AA.  AA was arrested on April
22, 2015, after stealing $5-worth of snacks from a convenience store.  He was charged with
trespass and petty larceny for pickpocketing less than $5.  His bail was set for $3,000, and he
was incarcerated pending trial.  AA was transferred to the Hampton Roads Regional Jail on May
11, 2015, his fourth trip to the Jail since 2010.  AA had a history of bipolar disorder and
schizophrenia and was determined by a forensic psychologist to be "manic and psychotic."  At
the end of May 2015, a court ordered him to be sent from the Jail to Eastern State Hospital for
competency restoration.  This order was never received by Eastern State Hospital, and AA
remained at the Jail.  Consequently, at a hearing at the end of July 2015, the court issued another
transfer order.  This order was received by Eastern State Hospital, but was not entered onto the
hospital's transfer log.  As a result, AA was not transferred to the hospital.  AA died on August
19, 2015, awaiting transfer to Eastern State Hospital, three months after the court's initial order.
His cause of death was heart failure as a result of rapid weight loss.  After his death, the court's
July 2015 transfer order was found in the file drawer of a hospital clerk, along with several other
court orders of detainees at local jails who, like AA, were awaiting transfer to the hospital for
competency restoration.

AA was at the Jail for 100 days between May 11 and his death on August 19, all of which
he spent in restrictive housing.  He was initially placed in restrictive housing upon admission for
his refusal to submit to a test for tuberculosis.  He remained in restrictive housing on
"administrative restriction – unable to adapt," a status used by the Jail at times for prisoners with
mental illness who have difficulty following rules.  He was in restrictive housing at the time of
his death.  During the time he was in restrictive housing, correctional officers noted that he
displayed erratic behavior, such as screaming and talking to himself inside his cell, snorting his
medication through his nose, clogging his toilet, and smearing fecal matter on himself and the
walls of his cell.  He repeatedly refused medical tests, medications, and visits from medical and
mental health staff.  Over the course of the 100 days that AA was in restrictive housing, he lost
nearly 40 pounds.  He was sent to the emergency room on July 30, due to "decompensation" and
"bilateral extremity edema" and was discharged that same day.  When he returned to the Jail, he
was not seen by a doctor.  He was found unresponsive in his cell 19 days later.

In the wake of AA's death, the Jail and several state and local entities conducted separate
investigations into what happened.  First, the Jail conducted its own internal investigation and, in
a report released eight days after AA's death, concluded that AA died of natural causes and that
there was no evidence of criminal wrongdoing by jail employees.  Investigators from two state
agencies, the Virginia Department of Behavioral Health and Developmental Services and the
Office of the State Inspector General, concluded that mistakes and flaws in the competency
restoration system led to AA's death.  Both investigations focused on errors made by actors in
the system other than the Jail, including the Portsmouth Community Services Board, the

---

[4] To protect the identity of prisoners, we use coded initials.

5

Portsmouth Department of Behavioral Healthcare Services, and Eastern State Hospital. The Virginia State Police has investigated AA's death, and AA's family has a federal wrongful death lawsuit pending.

In August 2016, one year after AA died, another prisoner, 60-year-old BB, died in his cell in the Jail, two days after submitting a request for emergency medical help due to his difficulties holding down food or water. BB was admitted to the Jail on June 7, 2016, for a probation violation relating to a prior conviction for shoplifting. This was his third time in the Jail. He had previously spent 404 days there in 2012 on assault and shoplifting charges, and 26 days in 2014 for a probation violation. When he was admitted to the Jail in June 2016, he had a mass on his neck.

Beginning on July 10 and continuing over the course of the next month, BB complained of heartburn and wrote several medical grievances. In one complaint, he wrote that the medication he was receiving was not relieving his abdominal pain and requested to see a doctor. He received a written response, nine days later, stating that he would be seen by a provider. He was not. On July 30, he wrote that he had not been able to keep down food for two weeks and had lost 14 pounds since the last time he was weighed. On August 1, he wrote that he needed to see a medical provider "ASAP" because he was having a lot of problems with his bladder movement and bowels and, the next day, complained that he had not used the bathroom in two weeks and had not been eating for days. He asked for help "before its [sic] too late." The head nurse responded in writing to this complaint by stating that BB had been seen at the hospital and had two scans done on his neck; however, she ignored his complaints about his stomach. On August 4, he wrote that he had blacked out two times in less than 24 hours and could not eat or hold down water. However, medical personnel did not respond, instead noting that he had been seen walking around on the top tier of the housing unit and then lying on the walkway. The nurse stated that "no seizure activity was present," nor any "signs or symptoms of concern."

BB died of a perforated ulcer several days later. The autopsy revealed that he had a pint of blood in his stomach at the time of his death. He had lost 35 pounds from the time he was admitted to the Jail in June to the time he died in early August, weighing 132 pounds at the time of his death. In June 2017, BB's family filed a wrongful death lawsuit against the Jail and its medical provider, CCS, alleging that the defendants were negligent in their care and violated his constitutional right to medical care. The Jail filed a cross-claim against CCS, alleging, in part, that CCS breached its contract with the Jail by failing to provide clinically necessary medical services to BB. On July 24, 2018, the court approved a settlement the parties reached in which CCS agreed to pay $525,000 and the Jail agreed to pay $100,000. As part of this agreement, neither CCS nor the Jail admitted any liability or wrongdoing.

Since AA and BB died, the Jail has taken steps to prevent similar deaths. The Jail brought in new personnel in leadership positions, including: a new superintendent, who has since been succeeded by the current superintendent; an assistant superintendent, who served in this position from October 2016 until May 2018; a chief information officer; and a human resources manager. It has reformed its internal investigations process to review staff misconduct, prisoner assaults, and prisoner deaths. To address the shortage in security staffing, the Virginia Compensation Board has conducted a staffing study. Jail administrators have worked with the Virginia Department of Corrections (DOC) to develop a high-priority transfer

list of prisoners whose needs could be better served at one of DOC's longer-term care facilities than at a local jail. One member of the Jail's Board Authority, who is also the Sheriff of a feeder jail recently stated publicly: "If we can get more diversion practices and resources in place, I believe that we can divert many of the folks that end up in the facility for simple things like trespassing, larceny, things that probably are a result of their mental illness that got them incarcerated." To that end, the Jail has also been administering a $900,000 grant awarded by the Commonwealth to increase discharge planning for those in the Jail with serious mental illness, and has had some success in reducing the number of grant participants who have been rearrested after discharge. These positive developments represent necessary steps to address some of the problems identified in this Notice, but are insufficient to remedy ongoing violations. Thus, additional work remains.

## IV.  CONDITIONS IDENTIFIED

The Department's investigation has uncovered facts that provide reasonable cause to conclude that conditions at the Jail violate the Constitution and federal law. In particular, the Department has reasonable cause to believe that the Jail fails to provide constitutionally adequate medical care and mental health care, and places prisoners with serious mental illness in restrictive housing for prolonged periods of time under conditions that violate prisoners' constitutional rights. The Department also has reasonable cause to conclude that these violations are pursuant to a pattern or practice of resistance to the full enjoyment of rights, privileges, or immunities secured or protected by the Constitution or laws of the United States. Further, the Department has reasonable cause to believe that the Jail violates the ADA by denying prisoners with mental health disabilities access to services, programs, and activities because of their disabilities.

As detailed below, the combination of numerous, specific and repeated violations of the Eighth and Fourteenth Amendments at the Jail, taken together with multiple deficient policies and processes that caused or contributed to those violations, is sufficient to establish a pattern or practice of constitutional violations under CRIPA. To establish a pattern or practice of violations, the United States must prove "more than the mere occurrence of isolated or 'accidental' or sporadic discriminatory acts." *See Int'l Bhd. of Teamsters*, 431 U.S. 324, 336 (1977). It must "establish by a preponderance of the evidence that [] [violating federal law] was . . . the regular rather than the unusual practice." *Id. See also Equal Employment Opportunity Comm'n v. Am. Nat. Bank*, 652 F.2d 1176, 1188 (4th Cir. 1981) (citing *Teamsters* when explaining that a "cumulation of evidence, including statistics, patterns, practices, general policies, or specific instances of discrimination" can be used to prove a pattern or practice). There is no defined quantum of facts needed to allege a pattern or practice of discrimination; "no mathematical formula is workable; nor was any intended. Each case must turn on its own facts." *United States* v. *W. Peachtree Tenth Corp.*, 437 F.2d 221, 227 (5th Cir. 1971).

### A. Medical Care at the Hampton Roads Regional Jail is Inadequate in Violation of Prisoners' Constitutional Rights

The Department has reasonable cause to believe that, in the totality of the circumstances described below, the Hampton Roads Regional Jail has engaged in a pattern or practice of failing to provide prisoners with adequate medical care in violation of their constitutional rights. The Jail holds both sentenced prisoners and pretrial detainees, and fails to provide both groups with constitutionally adequate medical care.

The Eighth Amendment protects sentenced prisoners from cruel and unusual punishment. U.S. CONST. amend. VIII. Jail conditions violate the Eighth Amendment's prohibition against cruel and unusual punishment where they result from prison officials' deliberate indifference to the substantial risk of serious harm to prisoners. *Farmer v. Brennan*, 511 U.S. 825, 828 (1994). The Eighth Amendment requires that the government provide adequate care to meet prisoners' serious medical needs. *Estelle*, 429 U.S. at 103-05; *Gordon v. Kidd*, 971 F.2d 1087, 1094 (4th Cir. 1992) (citing *Estelle*, 429 U.S. at 103-05).

The Eighth Amendment prohibits a failure of prison authorities to treat a prisoner's medical needs where such failure amounts to "physical 'torture or a lingering death.'" *Estelle v. Gamble*, 429 U.S. 97, 103 (1976) (quoting *In re Kemmler*, 136 U.S. 436, 447 (1890)). "[D]enial of medical care is cruel and unusual because, in the worst case, it can result in physical torture, and, even in less serious cases, it can result in pain without any penological purpose." *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981) (citing *Estelle*, 429 U.S. at 103). "Prisoners are dependent on the State for food, clothing, and necessary medical care. . . . Just as a prisoner may starve if not fed, he or she may suffer or die if not provided adequate medical care. A prison that deprives prisoners of basic sustenance, including adequate medical care, is incompatible with the concept of human dignity and has no place in civilized society." *Brown v. Plata*, 563 U.S. 493, 510-11 (2011). The state's obligation remains even if it has contracted with a private party to provide medical care. *West v. Atkins*, 487 U.S. 42, 56 (1988).

Under the Constitution, prisoners are protected from the risk of future harm, even if no prisoner has suffered actual harm at the time the violation is found. *See Farmer*, 511 U.S. at 845-47; *Helling v. McKinney*, 509 U.S. 25, 33 (1993) ("a remedy for unsafe conditions need not await a tragic event" and "the Eighth Amendment protects against future harms to inmates," even when the harm "might not affect all of those exposed" to the risk and even when the harm would not manifest itself immediately). A facility fails to provide constitutionally adequate medical care if: (1) the deprivation alleged is sufficiently serious, and (2) the prisoner demonstrates that the prison official had a sufficiently culpable state of mind such that he was deliberately indifferent to prisoner health or safety. *Wilson v. Seiter*, 501 U.S. 294, 298 (1991).

The rights of pretrial detainees are guaranteed by the Fourteenth Amendment, which, the Supreme Court has consistently held, provides protection at least equal to the Eighth Amendment. *Bell v. Wolfish*, 441 U.S. 520, 545 (1979) ("pretrial detainees, who have not been convicted of any crimes, retain at least those constitutional rights . . . enjoyed by convicted prisoners"). In analyzing pretrial detainees' Fourteenth Amendment claims, courts have therefore looked to the Eighth Amendment to provide the relevant legal standard. *See, e.g.*, *Westmoreland v. Brown*, 883 F. Supp. 67, 76 (E.D. Va. 1995); *Castro v. Cnty. of Los Angeles*,

833 F.3d 1060, 1068-69 (9th Cir. 2016) (*en banc*) (explaining that it read *Farmer* and *Bell* as creating a single "deliberate indifference" test for plaintiffs who bring a constitutional claim under either the Fourteenth or Eighth Amendments).[5]

1.   Prisoners at the Jail have Serious Medical Needs Requiring Treatment

Many prisoners at the Jail have serious medical needs that require treatment and place them at serious risk of harm if not adequately addressed. A medical condition is serious if it "has been diagnosed by a physician as mandating treatment" or is "so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Iko v. Shreve*, 535 F.3d 225, 241 (4th Cir. 2008) (quoting *Henderson v. Sheahan*, 196 F.3d 839, 846 (7th Cir. 1999)). Typically, the prisoners sent by the five city jails to the Hampton Roads Regional Jail are those with the most serious medical and mental health needs, who are the most difficult to manage, and who require the highest level of services. Of the 1,100 prisoners, about 750 are on the chronic care list at any given time. The Jail has 60 beds in its medical housing unit, all of which are typically full.

2.   Prisoners are Subjected to a Substantial Risk of Serious Harm as a Result of Inadequate Medical Care

Prisoners at the Jail suffer a deficient intake process and often lack access to appropriate medical and mental health care. *See Shabazz v. Prison Health Servs., Inc.*, No. 3:10-cv-190, 2011 WL 3489661, at *6 (E.D. Va. Aug. 9, 2011) ("In addition to alleging that the medical need was objectively serious, Plaintiff must plausibly allege facts indicating that the delay in the provision of medical care resulted in substantial harm.") (internal citations omitted). Prisoners at the Jail have been exposed to the substantial risk of harm through the Jail's deficient intake process and lack of continuity of care, lack of access to care, and deficient quality of care. We have reasonable cause to believe that the totality of these deficiencies, as described below, result in medical care that is inadequate and in violation of the prisoners' constitutional rights.

a.   *Deficient Intake Process and Continuity of Care*

Adequate medical records are necessary in order for a jail to provide constitutionally adequate care. *See, e.g., Newman v. State of Ala.*, 503 F.2d 1320, 1323 n.4 (5th Cir. 1974) (affirming district court's conclusion that the medical care in the Alabama Penal System violated the Eighth Amendment due in part to "paltry records" accompanying prisoners being transferred); *Ginest v. Bd. of Cnty. Comm'rs of Carbon Cnty.*, 333 F. Supp. 2d 1190, 1205-07 (concluding that the jail's medical record keeping system violates Eighth Amendment standards because records were missing, including those from prisoners' outside hospitalizations); *Coleman v. Wilson*, 912 F. Supp. 1282, 1314 (E.D. Cal. 1995) ("A necessary component of

---

[5] In *Kingsley v. Hendrickson*, 135 S. Ct. 2466 (2015), the Supreme Court held that the correct standard to be applied to an excessive use of force claim brought by a pretrial detainee under the Fourteenth Amendment was not whether the officers were subjectively aware that their use of force was unreasonable, but whether the officers' use of that force was objectively unreasonable. 135 S. Ct. at 2470. The Fourth Circuit has yet to reexamine its standard for analyzing Fourteenth Amendment conditions of confinement claims by pretrial detainees in light of *Kingsley*. For this reason, we apply the Eighth Amendment standard to pretrial detainees and sentenced prisoners alike.

minimally adequate medical care is maintenance of complete and accurate medical records," which includes records from county jails from which prisoners are transferred); *Inmates of Occoquan v. Barry*, 717 F. Supp. 854, 867 (D.D.C. 1989) (concluding that there were "systemic failures throughout the entire medical services" because prison failed, among other things, to ensure that medical records followed prisoners upon transfer). The Jail's medical records are inadequate and inaccurate because the Jail fails to receive and review medical records from transferring jails at intake and fails to conduct all intake screens within 14 days of admission.

The Jail receives all of its prisoners as transfers from five local city jails, Monday through Friday. On the day before the prisoner is transferred, the Jail receives a phone call from the transferring jail explaining the reason why the prisoner is being moved. The Jail, however, does not receive the transferring jail's medical records about the prisoner until after the prisoner has been screened by the Jail. Therefore, when prisoners are admitted to the Jail and a nurse conducts the initial medical screen, the nurse does not have the transferring jail's prior medical records about the prisoner to review. This can result in the Jail screening nurse recording different answers about the prisoner's condition and medical history than those recorded by the city jail from which the prisoner transferred. This happens despite the fact that most of the city jails use the same medical contractor, with the same electronic medical system.

Prompt medical screening upon intake is another necessary element of a constitutionally adequate system. *See Dawson v. Kendrick*, 527 F. Supp. 1252, 1307 (S.D. W.Va. 1981) ("It is generally recognized that prompt medical screening may be a medical necessity in pre-trial detention facilities."). After the initial medical screen, prisoners are supposed to be seen by a nurse within 14 days of admission. In practice, prisoners are rarely seen within 14 days and often significantly longer. This presents problems because prisoners are sent to the Jail precisely because of the complexity of their medical problems. Where a prisoner's condition is sufficiently serious or urgent, delays in diagnosis and treatment, even by a few days or a few hours, can result in "substantial harm" to the patient that rises to the level of an Eighth Amendment violation. *See Turner v. Ruffin*, No. 1:16-cv-510, 2017 WL 2405371, at *4 (E.D. Va. June 2, 2017) ("A delay in medical treatment may constitute deliberate indifference" if it results in "substantial harm [such as] lifelong handicap, permanent loss or considerable pain."); *Sealock v. Colorado*, 218 F.3d 1205, 1210-11 (10th Cir. 2000) (holding that a several-hour delay in transporting prisoner experiencing heart attack to a hospital could constitute an Eighth Amendment violation).

    b.   *Lack of Access to Care*

One of the primary deficiencies in the Jail's medical care system is that it does not take prisoner requests for treatment seriously, and often ignores them. The Jail's failure to take prisoner requests for medical treatment seriously can result in significant delays, causing harm to prisoners with serious medical issues and violating their constitutional rights. *See Webb v. Hamidullah*, 281 F. App'x 159, 166 (4th Cir. 2008). The Jail does not have an adequate system for prisoners to make their medical problems known to staff to facilitate "ready access to medical care." *See Casey v. Lewis*, 834 F. Supp. 1477, 1545 (D. Ariz. 1993) (failure to provide prisoners with "ready access to medical care" amounts to deliberate indifference if prisoners are unable to make their medical problems known to staff). Prisoners have two avenues to request treatment – the sick call process, which is used for first-time requests for treatment, and the grievance process, which is used for complaints about prior treatment or if prior requests for treatment have

gone unanswered.  With regard to the sick call process, we found that sick call slips are not routinely collected and triaged in a timely manner.  When we visited the Jail in May 2017, the nursing director was admonishing the nursing staff for leaving sick call slips uncollected in a box for one month without any answer.

Even if sick call slips are timely collected and triaged, prisoners often have to wait a long time to see a medical provider.  A quality improvement study conducted by the Jail's medical contractor in January 2017 revealed that only 25% of sick call patients who were triaged by a sick call nurse and referred to a health care provider were seen by a health care provider within seven days of the referral.  Delays in access to care can have significant health consequences for prisoners and result in deterioration that requires emergent medical care.  The Jail's failure to adequately and timely address concerns raised in sick call forms resulted in worsening conditions and harm in the following illustrative cases:

- CC is a 61-year-old prisoner who requires regular dialysis treatment.  On July 10, 2016, he submitted a sick call form stating that the part of his arm where the dialysis port was placed hurt very badly after dialysis.  The sick call form was not triaged by a nurse until July 19, when the nurse noted that CC would "be scheduled to come to the clinic to be assessed by the medical staff."  He was not seen by medical staff in response to this sick call request.  CC raised this issue again in another sick call form on October 8, asking to be taken to see a vascular doctor because he was experiencing a lot of arm pain at the dialysis port site during dialysis.  Again, his form was not reviewed by a nurse until one week later.  Upon review, the triage nurse simply said, "Thank you for expressing your concern."  Without any treatment, the problem became so bad that he was sent to the emergency room on November 9.

- DD, a 69-year-old prisoner, died in March 2016 of severe acute pancreatitis, which was caused by gall stones and coronary artery disease.  He was incarcerated for a probation violation on a previous felony offense.  He repeatedly sought emergency care for his abdominal pain and his chest pain, but there is no documented evidence that he received any medical assistance in the days prior to his death.  In the two days before his death, DD wrote several sick call slips.  A correctional officer returned one request because DD used profanity and there is no evidence in his medical chart that this request was received by medical staff or that they responded to his complaint.  Two hours before his death, he had another prisoner submit a sick call request on his behalf.  DD was given a form by a correctional officer, to whom DD complained that he had chest pain and had not had a bowel movement in five days.  DD wrote on the form, "Help me please!"  He died hours later, before the grievance was received by the medical staff and after DD was denied access to emergency care.

Lack of access to medical care is especially acute for those prisoners held in restrictive housing.  Because they are locked down in their cells for between 23 and 24 hours each day, these prisoners have difficulty accessing sick call slips and then returning sick call slips to the box.  This results in additional delays in access to care, beyond those experienced by prisoners in general population, creating a serious risk of harm for this population.  For example:

- EE, a 53-year-old prisoner, was admitted to the Jail on March 31, 2015[6] and died ten days later. On admission, he was noted to be extremely psychotic, incoherent, and agitated, throwing feces. Medical staff recognized his psychosis, but were unable to transfer him to Eastern State Hospital because he first needed medical clearance. He was not seen by a psychiatrist to facilitate the clearance and refused his physical for three days after his admission. On April 3, he was moved to restrictive housing *because* he was actively psychotic. Despite being psychotic, in his medical chart, it was noted that there were no contraindications to placement in restrictive housing. On April 5, a nurse wrote: "Patient seen in pod at officer request. Pt naked and kneeling on the floor. Pt. with RLQ (right lower quadrant of abdomen) bulge. Pressing against with his hand. Verbalizes intense pain. [Pod] officer to notify charge nurse." Fourteen hours later, a nurse wrote: "Pt seen on the pod. Per pod officer, pt. has thrown up and the vomit 'looked and smelled like feces.' Pt observed kneeling down on the floor with the lid to his blue bin in front of him which is covered with greenish clear bile. Pt will not verbally respond to questions. Will schedule visit with MD for evaluation." The nurse did not examine EE. She did not attempt to obtain vital signs. She did not call for emergency medical attention. The next day, EE remained in restrictive housing. He was not seen by the nurse or medical provider. A chart note from the director of mental health services on April 7 reads: "Inmate (sic) went up to assess inmate to check on his mental history, and he was found unresponsive at the time. A code was called, and he later died from complications due to a duodenal ulcer. This was the first and only mental health visit EE received at the Jail. He did not receive any medical or psychiatric evaluation. According to our medical expert, EE's death was preventable had he received adequate medical attention.

The Jail also does not take prisoner grievances about lack of access to medical care seriously, resulting in significant harm to prisoners, even death. For prisoners, grievances are the only mechanism through which they can express complaints about the quality of the medical care and indicate when a medical problem is worsening. When Jail staff are presented with evidence that a prisoner is suffering from a serious medical condition and in need of prompt medical attention, a delay in rendering treatment can meet the Eighth Amendment standard. *See Sealock*, 218 F.3d at 1210 (delay of several hours in rendering medical treatment to prisoners presenting symptoms of a heart attack met the subjective element of the Eighth Amendment test for purposes of summary judgment). In December 2016, the Jail did not substantiate any of the medical grievances related to being seen in a timely manner. Yet, one prisoner wrote that she wanted to be seen by mental health staff to discuss an issue with her medication, which she had stopped receiving during pill pass. During a follow-up visit with the Mental Health Director five days later, the Director noted that although the psychiatrist ordered that an antipsychotic medication be continued, this order was not entered into the system and no medication was dispensed. Staff then responded to the prisoner's grievance by stating, "[y]our concern has been discussed with Mental Health Director. . . . Thank you for bringing this to our attention," and then was marked as unsubstantiated.

---

[6] The Jail's current medical contractor, CCS, did not start working in the Jail until December 2015. Medical care at the Jail at the time of this incident was provided by the Jail's previous medical contractor, Naphcare. Despite switching medical contractors, inadequate medical treatment has continued as evidenced by the examples in section IV.A that occurred after CCS began working at the jail in December 2015.

Other medical grievances were marked as unsubstantiated without any response given. Also, as described more fully above, BB was denied access to medical care in the days and hours leading up to his death. His emergency grievances were ignored as his condition worsened, and he slowly bled to death. The head nurse ignored his complaints about problems eating and with his bladder, by commenting that he had already been seen at the hospital and had two scans done on his neck. Delays in, or failure to render, medical treatment to a prisoner suffering from a bleeding ulcer, such as BB in the example above, is sufficient to constitute an Eighth Amendment violation. *See Smith v. Smith*, 589 F.3d 736, 739 (4th Cir. 2009).

    *c.*    *Inadequate Quality of Care*

As a result of systemic failures, the Jail often fails to provide an adequate level of care, including proper medication administration. *See, e.g.*, *Tillery v. Owens*, 719 F. Supp. 1256, 1292, 1307 (W.D. Pa. 1989) (finding that one of the medical service requirements for prisons included medication distribution). At any given time, there are approximately 873 prisoners receiving at least one medication, representing approximately 79% of the total population at the Jail. Only seven nurses provide around-the-clock coverage for medication distribution. During pill pass, prisoners not on lockdown status are supposed to line up at the door of their pod to receive medications from the nurse. The nurse administers medications to the prisoner, checks to ensure the prisoner has swallowed the medications, and then makes a notation of the successful medication administration. For prisoners who do not appear at the door for pill pass, the nurse is supposed to enter the pod with the security officer and confirm that the prisoner is refusing to take his medications. If a prisoner is refusing his medications, then the nurse is supposed to prepare a "Refusal of Treatment" form, which the nurse and the prisoner are to sign. If the prisoner refuses, then an additional person must witness the refusal and sign the form.

Available records and the following examples indicate that nurses are not accurately recording when a prisoner is refusing medications. *See, e.g.*, *Ginest*, 333 F. Supp. 2d at 1205 ("Jails and prisons must maintain adequate, complete, and accurate medical records. . . . When inmates have shown systemic inadequacies in a jail's or prison's system of medical record keeping . . . courts have issued prophylactic injunctive relief."). Furthermore, there is at least one instance where a nurse falsified a prisoner's medication records:

- FF, a 36-year-old prisoner with a history of sickle-cell anemia, was admitted to the Jail on March 1, 2017. Over the course of his stay, his condition worsened, as he experienced bouts of pneumonia and increasingly had difficulty breathing. He was sent to the emergency room on August 14, 2017, released that same day, and then readmitted to the emergency room on August 16. He was not seen by any medical professionals when he returned from the emergency room on August 14, or the next day on August 15. He remained in the hospital until his death on August 22. On August 21, despite FF being in the hospital, a nurse at the Jail signed a "Refusal of Treatment" form, indicating that FF refused his medications during the morning pill pass, stating, "I don't want it," and further indicating that FF refused to sign the form. There were a series of other notations in his medical file that he refused medications on August 19, 20, 21, and 23, despite being in the hospital and, in the case of the August 23 entry, having already died.

- As described earlier, in the early morning of August 6, 2016, 60-year-old BB died in the Jail as a result of internal bleeding after submitting several emergency requests for

13

medical care. At the 9:00 a.m. pill pass immediately following his death on August 6, the nurse did not seem to be aware that the prisoner had died, noting simply that he "did not attend pill pass." There is no entry for the 9:00 p.m. pill pass for that evening, despite BB having died early that morning. The first notation of BB's death in his medication record was over 24 hours later, at the 9:00 a.m. pill pass on August 7. However, during the pill pass later that day at 9:00 p.m. on August 7, and at the pill pass at 9:00 a.m. on August 8, two nurses indicated that the patient missed his pill pass because he was a "no show" and because he was "not in [his] cell."

The Jail has acknowledged problems with its pill pass procedure and has taken steps to try to ensure the accuracy of medication distributions and refusals. This includes locking down most housing units during pill pass and opening four cell doors at a time. The new procedure was first implemented in mid-September 2017. We look forward to learning whether the new procedures will be adequate to address the issues identified above.

Many prisoners do not receive the level of care appropriate to their condition when they are seen by a medical provider. Because of the number of prisoners at the Jail with serious medical needs and known shortages in medical and security staffing, prisoners are often not sent to receive outside medical care when they should. "[A]n unusually long delay between the emergence of a serious medical need and treatment of that need" is grounds for finding that medical care is constitutionally inadequate. *See Coppage v. Mann*, 906 F. Supp. 1025, 1041 (E.D. Va. 1995) (citing *Loe v. Armistead*, 582 F.2d 1291, 1296 (4th Cir. 1978), *cert. denied*, 446 U.S. 928 (1980)). *See also Casey*, 834 F. Supp. at 1546 (noting that referrals to outside care must be "reasonably speedy" such that prisoners with significant medical conditions are not made to endure "unacceptably long waits"). This is particularly true if the delay results in substantial harm to the patient, such as severe pain, increase in significance of the medical problem, or signs that the problem is becoming untreatable. *See Webb*, 281 F. App'x at 167. Failures to send prisoners to outside medical appointments in a timely fashion have resulted in significant harm to prisoners held at the Jail, as in the following examples:

- GG, a 56-year-old prisoner, came to the Jail from the Norfolk City Jail on June 15, 2017. The medical records transferred from Norfolk indicated a large liver mass, which was discovered during an ultrasound on June 6. Despite being aware of the presence of this large liver mass, the Jail's medical provider did not schedule a biopsy of this mass in the five weeks between GG's arrival at the Jail and his death. During this time, GG was in great pain, was losing weight, was becoming increasingly jaundiced, was severely dehydrated, and was having difficulty eating. The cause of his pain and the exact nature of the mass in his abdomen was not diagnosed, and no steps were taken to schedule an appointment with an outside provider to obtain a diagnosis. On July 16, a nurse saw him vomiting. He had an elevated and irregular heart rate and complained of extreme pain. The nurse wrote in his chart that she would notify the on-call physician. GG was not seen by a doctor until July 18, for a routine, chronic care visit. No biopsy of the large abdominal mass was performed during the next five weeks. Staff watched him deteriorate without benefit of diagnosis or treatment. He died on July 25, of liver cancer due to hepatitis B and hepatitis C infection.

14

- HH, a 52-year-old prisoner, was admitted to the Jail on December 28, 2012, from the Norfolk City Jail. She had diabetes, thyroid disease, congestive heart failure, and was actively psychotic upon admission. On January 11, 2013, she wrote that her whole body was swollen and that she was having problems breathing. She had labs drawn on January 12, which were not evaluated by the doctor until January 23. When she was seen on January 23, she was noted to be unstable and unresponsive to the treatment previously prescribed; she was not sent for the emergency evaluation and treatment she required, but allowed to deteriorate further at the Jail. Two days later, she complained of chest pain, had an increased pulse, and increased blood pressure. She was then admitted to the hospital and died four days later.

   3. Inadequate Staffing and Inadequate Monitoring and Oversight Contribute to Inadequate Medical Care

Given the Jail's high needs population, medical staffing at the Jail is inadequate. This lack of adequate staffing contributed to systemic failures and delays, seriously harming prisoners and creating a substantial risk of serious harm. At the beginning of CCS's contract in late 2015, 37.7 medical and mental health full-time equivalent employees (FTEs) were allocated to meet the needs of the prisoner population, with 32.90 of these staff members devoted to medical needs. This number included the Medical Director, who was the only M.D. on staff. The Medical Director works 40 hours per week, Monday through Friday. From January to September 2016, despite allocations for round-the-clock medication staff in the contract, no medical staff members worked the third, night shift. This left an 8-hour window where there were no medical staff on site. Staffing coverage has since increased so that on the weekends and at night, the main medical clinic is staffed by a registered nurse and a medical assistant.

While medical staffing levels in February 2017 increased to 50.8 FTEs, this number of medical staff still is not enough to meet the needs of the prisoner population. The Jail's policy and contract with CCS requires a medical provider to see prisoners on the chronic care list within 30 days of admission and then every 90 days thereafter. As of March 2017, CCS was not able to see chronic care patients every 90 days, as required by policy and under their contract with the Jail. Lack of adequate nursing staff has also had an effect on regular medication administration. The Jail has only seven nurses to provide around-the-clock coverage for administering medications to over 800 prisoners between two to three times per day. Because of the burden placed on them by regular medication administration, nurses are not available to conduct other treatments for prisoners, like post-operation wound care. The following example illustrates how the shortage of nursing staff has likely prevented prisoners from accessing medical care and likely resulted in serious harm:

- On March 3, 2017, 64-year-old II had a complex ophthalmological procedure, which involved placing a drain inside his eye to remove built-up fluid as a result of his glaucoma. After the procedure, II complained of pain and deterioration of his vision, yet staff failed to call the ophthalmologist and no action was taken by the Jail's medical staff. Nursing staff provided him with gauze pads, which he used to wipe his eye and place under the bandage. These pads were not in the orders prescribed by the ophthalmologist and at his 10-day post-operation appointment, the doctor noted that the gauze under the eye shield had caused massive inflammation and a corneal abrasion.

15

The Jail has also had a problem recruiting and retaining medical staff. From the beginning of the CCS contract in December 2015 until June 2017, the Jail did not have a permanent Medical Director. During this 18-month period, the Jail had 27 different interim medical directors, some of whom only lasted a few days. This means that most prisoners saw any given interim medical director (the only M.D.) once. A high rate of medical leadership turnover poses a risk to prisoner safety, especially in such a high-needs population. The Jail's Board has acknowledged this risk, noting that its population would be better served by a full-time medical director on staff who could provide leadership and a unified care plan, instead of a series of interim directors coming from CCS's corporate offices.

In addition to inadequate levels of medical staff, inadequate security staffing has prevented prisoners from accessing medical and mental health care at the Jail. Almost every day, there are not enough security staff to escort prisoners in the Jail from the housing units to the medical clinic for their appointments; to escort nurses during pill pass; and to escort medical and mental health professionals seeking access to prisoners in the housing units. Additionally, at times, there are inadequate security staff to transport prisoners to their outside medical appointments, which totaled 1,204 in 2016. Due to limitations on availability of security staff, CCS has been told by Jail staff to keep the number of outside medical appointments per day to five or less. This includes hospitalized prisoners, who require constant watch by a Jail security officer 24 hours per day. When there are not enough security staff to transport prisoners, appointments for prisoners with issues deemed to be non-critical must be rescheduled. Lack of staff to transport prisoners to the medical clinic and to outside medical appointments has resulted in many prisoners missing their appointments or having their appointments delayed.

In addition, the Jail does not have monitoring systems in place to identify and address deficient areas of its medical care. The Jail's medical provider does not routinely conduct clinical studies of the quality of the care that it provides. Instead, the Health Services Administrator for the Jail's medical provider conducts monthly audits that are largely administrative in nature, such as recording the number of scheduled and unscheduled visits, the presence of health care documentation, and the documentation of medication administration. Though she completes a series of audits every month, in 2017, only one audit involved a review of prisoner charts by the site medical director to evaluate medical care. Of the administrative audits that are done, some fail to identify existing problems with medical care.

Furthermore, the Jail does not have a full-time staff member to monitor the Jail's contract with CCS. During a meeting in December 2016, Board members noted the importance of monitoring medical staff, stating "one of the most important [things, which] any Jail and the Sheriffs can tell you [, is] that you have to have someone from the Jail Security Staff that stays on top of the Medical Provider. If you don't then you may have cost issues, or delivery of medical services [issues]." However, the Jail has not had any Jail employee monitoring the medical contract, instead relying on corrections officers to alert Jail management about any problems. In 2011, the Jail eliminated its Medical Compliance Manager position and has not since replaced it. At the end of 2015, the Jail hired an independent contractor to review its medical contract with Naphcare and later with CCS. This contractor works remotely, devoting about 20 hours per month to work for the Jail. Since the middle of 2016, he has not attended the monthly meetings between senior security staff and CCS medical providers, transitioning to a

16

more passive role managing the contract. Collectively, these systemic deficiencies contribute to inadequate medical care.

4. Officials at the Jail Knew of the Risk to Prisoner Health and Safety Posed by Inadequate Medical Care and Disregarded It

Officials at the Jail have been aware of the deficiencies in medical care for years and have failed to adequately address these deficiencies. By disregarding the obvious risks to prisoner health and safety, officials at the Jail evince a deliberate indifference to prisoners' constitutional rights to adequate medical care. *See Hope v. Pelzer*, 536 U.S. 730, 736-38 (2002). *See also Brown v. N.C. Dep't of Corr.*, 612 F.3d 720, 723 (4th Cir. 2010) (quoting *Odom v. S.C. Dep't of Corr.*, 349 F.3d 765, 770 (4th Cir. 2003) ("A prison official demonstrates deliberate indifference if he 'knows of and disregards an excessive risk to inmate health or safety.'")). Jail officials have been aware of the harm caused to prisoners due to inadequate medical treatment and lack of access to care at least since the 2015 death of AA, which attracted national attention.

Though the Jail switched medical providers after AA's death, medical care under the Jail's current medical provider, CCS, has not significantly improved. Nine months after switching medical providers and one year after AA's death, BB died of a bleeding ulcer after his repeated requests for medical attention were ignored. In the Jail's answer and cross-claim filed in the wrongful death suit brought by the administrators of BB's estate, the Jail claims that CCS breached its service agreement with the Jail by "failing to provide appropriate clinically necessary medical services, sick call, on-site health care services, and offsite services and hospitalization" to the deceased prisoner prior to his death in August 2016. Though the Jail claims that the medical services provided to this prisoner prior to his death were deficient, the Jail nonetheless chose to renew CCS's contract in February 2017.

**B.  Mental Health Care at the Jail is Inadequate in Violation of Prisoners' Constitutional Rights**

The Department also has reasonable cause to believe that the Jail has engaged in a pattern or practice of failing to provide prisoners with adequate mental health care in violation of their Eighth and Fourteenth Amendment rights. The Eighth Amendment's prohibition against cruel and unusual punishment requires jails to provide prisoners with adequate mental health care. *See Bowring v. Godwin*, 551 F.2d 44, 47 (4th Cir. 1977) (noting "no underlying distinction between the right to medical care for physical ills and its psychological or psychiatric counterpart"). As with medical care, deprivations of mental health care violate the Eighth Amendment if they are sufficiently serious and the prison official had a sufficiently culpable state of mind such that he was deliberately indifferent to prisoner health or safety. *Wilson*, 501 U.S. at 298. The protections afforded pretrial detainees are at least as great as a convicted prisoner's Eighth Amendment rights. *See Buffington v. Baltimore Cty., Md.*, 913 F.2d 113, 119-20 (4th Cir. 1990).

1. Prisoners at the Jail have Serious Mental Health Needs Requiring Treatment

Prisoners at the Jail have serious mental health needs that require treatment and place them at serious risk of harm if their needs are not addressed adequately. The Jail has both a large number of prisoners receiving some form of mental health treatment and a large number of

17

prisoners with serious mental health needs. The Jail consistently reports that approximately 50% of its prisoner population is on psychotropic medication at any given time. In June 2016, the Jail dispensed mental health medications to prisoners on 1,052 different prescriptions, the most of any jail in Virginia.

The Jail also has a high number of prisoners with serious mental illness compared to other jails in Virginia. For June 2017, the 54 jails in Virginia reported that an average of 9.55% of their overall prisoner population had a serious mental illness. Hampton Roads Regional Jail had the highest percentage of prisoners with a serious mental illness.[7] Between December 1, 2016, and July 25, 2017, the Jail identified 405 prisoners with serious mental illness, 268 of whom were held at the Jail as of July 25. This represents nearly 25% of the prisoners held at the Jail at any given time, which is much higher than the statewide average of 9.55% as reported in June 2017. Many of these prisoners had mental health needs so severe that they required treatment at one of the state psychiatric hospitals.

In June 2017, Hampton Roads Regional Jail also had the second highest number of military veterans as prisoners, with 84 out of 999 prisoners statewide. Of those veterans, 40 (or approximately 47%) had mental illness. Twenty-three of these 84 (or approximately 27%) were homeless prior to coming to Jail.

> 2.  Prisoners are Subjected to a Substantial Risk of Serious Harm as a Result of Inadequate Mental Health Care

The Jail's inadequate mental health care places prisoners with serious mental illness at serious risk of harm. Courts have previously identified many components as being minimally necessary for a facility's mental health program, including: (1) a systematic program for screening and evaluating prisoners in order to identify those who require mental health treatment; (2) individualized treatment plans that provide for treatment that is more than placement in restrictive housing and that includes close supervision of the prisoner patients; (3) prescription and administration of psychotropic medications with appropriate supervision coupled with adequate psychotherapy; and (4) a basic program for identification, treatment, and supervision of prisoners with suicidal tendencies. *See, e.g.*, *Ruiz v. Estelle*, 503 F. Supp. 1265, 1339 (S.D. Tex. 1980) *aff'd in part and rev'd in part on other grounds*, 679 F.2d 1115 (5th Cir. 1982); *Balla v. Idaho State Bd. of Corr.*, 595 F. Supp. 1558, 1577 (D. Idaho 1984); *Coleman v. Wilson*, 912 F. Supp. 1282, 1298 (E.D. Cal. 1995). While a denial of any one of these factors alone may not amount to a constitutional violation, courts have examined these factors together to evaluate the constitutional adequacy of a jail's mental health program.

> *a.  Inadequate Screening and Identification of Prisoners with Mental Illness*

The Jail does not adequately screen its prisoners for mental health issues at intake. Courts have considered whether a prison employs a systematic program to screen and evaluate prisoners for mental illness and suicidality, including supervision of intake nurses by higher-

---

[7] The Jail defines serious mental illness as a prisoner with one or more of the following diagnoses: schizophrenia, schizoaffective disorder, bipolar disorder, major depression, an intellectual disability, gender dysphoria, and juveniles with mental health needs.

level providers. *See, e.g.*, *Coleman*, 912 F. Supp. 1282, 1305 (E.D. Cal. 1995) (concluding that the Constitution requires a systematic screening program). By contrast, the system at the Jail relies on a prisoner self-reporting any mental health issues, which is not a proper or constitutionally adequate intake system. *See Woodward v. Corr. Med. Servs. of Illinois, Inc.*, 368 F.3d 917, 927-28 (7th Cir. 2004) (noting that evidence that nurse's practice of not completing mental health intake forms and nurse's supervisor's failure to review the forms could amount to an Eighth Amendment violation); *Thompson v. Ackal*, 15-cv-02288, 2016 WL 1394352, at *8 (W.D. La. Mar. 9, 2016) (concluding that inaccuracies in the completion of intake and mental health screening forms, along with other inadequacies in care, amounted to a constitutional violation); *Ramirez v. Ferguson*, 08-cv-5038, 2011 WL 1157997, at *25-26 (W.D. Ark. Mar. 29, 2011) (concluding that prison's failure to train officers on proper intake procedure, especially regarding prisoner's past mental health problems, amounted to a constitutional violation). If the prisoner does self-report a mental health issue and indicates that he was a client of a local community services board (CSB) prior to coming to the Jail, the Jail does not have a practice of calling the CSB to learn more about the prisoner's mental health history.

If the prisoner does not self-report mental health issues during the screening and these issues are not later raised by the prisoner or identified independently by a correctional officer, then the prisoner will not be placed on the mental health caseload and consequently will not be seen by mental health staff. The intake nurse is responsible for telling the psychiatrist what medications the prisoner is currently taking. If the intake nurse fails to communicate this information to the psychiatrist or communicates the incorrect information, then the prisoner needs to wait until his next medical appointment. That appointment often occurs weeks after an initial medication error, during which time the prisoner is not receiving the proper medication.

Furthermore, the intake screening is conducted by a nurse who is not trained to be able to identify symptoms of mental illness. Nurse's screenings are not systematically reviewed by supervisors for accuracy. This results in an under-identification of prisoners with mental health issues and prisoners not receiving the care that they need or having their care delayed. Lack of treatment or delays in treatment can result in significant harm, including in the following examples:

- JJ, a 21-year-old prisoner, was admitted to the Jail on December 9, 2016. He was admitted directly from the hospital, where he had been for the past several weeks recovering from a nearly fatal suicide attempt. Upon admission, he was diagnosed with anxiety and unspecified major depression. The intake nurse recommended JJ be housed in general population rather than in mental health housing and noted that he was being referred to mental health for routine problems, which were non-emergent. She did not check the box to indicate that JJ had acute problems relating to suicide, despite JJ coming to the Jail after a suicide attempt. JJ was housed in general population until he was moved several hours later by the Mental Health Director, who ordered that JJ be placed in restrictive housing on suicide watch, where he remained until February 23, 2017. Although the hospital recommended intense psychiatric engagement upon discharge to the Jail, he was not seen at the Jail by a psychiatrist until January 6, 2017. He did not

receive intense psychiatric engagement and committed suicide at the Jail on March 12, 2017.

- EE, a 53-year-old prisoner, was admitted to the Jail on March 31, 2015, and died ten days later.  A mental health evaluation completed at the Hampton City Jail the day he was transferred to the Hampton Roads Regional Jail noted that he was extremely psychotic, incoherent, and agitated.  Although he had psychiatric symptoms, no mental health evaluation was done at the Regional Jail prior to his death.

   *b.   Inadequate Treatment Planning*

The Jail also fails to provide prisoners on its mental health caseload with individualized treatment plans.  The Jail's medical provider, CCS, acknowledges that "[s]uccessful mental health delivery requires psychiatric medication management, relevant treatment planning and discharge planning."  However, before December 2016, CCS did not create individualized treatment plans.  Since that time, mental health staff have tried to create such plans, but due to limited staffing, the psychiatrist has no time to review the plans to ensure that they provide adequate focus, purpose, and direction for the delivery of service.  Instead, he only has time to sign off on them.  The resulting plans are short documents that are neither comprehensive nor person-centered and do not incorporate input from the prisoner.  Instead, the plans only include a basic checklist for goals that are essentially the same for each prisoner.  Mental health staff have failed to develop adequate, individualized treatment plans, including for the following individuals:

- KK, a 28-year-old prisoner, was admitted to the Jail on February 22, 2017.  While detained, she delivered a stillborn child on March 22.  She was seen by a psychiatrist on March 24, when Prozac was started.  There was no documented follow-up after this visit.  Although KK had a treatment plan, there was no apparent input by a psychiatrist, and there was no specific information provided about the nature or the frequency of the counseling to be provided or how often KK was to meet with a mental health professional.

- LL, a 39-year-old prisoner, was admitted to the Jail on November 15, 2016, with a diagnosis of bipolar disorder.  He was seen via telepsychiatry on December 8.  Although the note indicated manic symptoms, his medication was not adjusted.  He was placed in restrictive housing on January 9, 2017, and voiced suicidal thoughts the next day.  His mental health symptoms and suicidal thoughts increased while he was in restrictive housing.  There was no documented treatment plan to provide focus, direction, and purpose to his treatment.

This treatment planning extends to the period immediately following a prisoner's discharge.  The Jail fails to provide some amount of medication for an outgoing prisoner who has been receiving treatment at the Jail for a period of time reasonably necessary for him to obtain treatment "on his own behalf."  *See Wakefield v. Thompson*, 177 F.3d 1160, 1164 (9th Cir. 1999) (the state has a duty to provide medication to an outgoing prisoner in a supply sufficient "to ensure that he has medication during the period of time reasonably necessary to permit him to consult a doctor and obtain a new supply").  *See also Lugo v. Senkowski*, 114 F. Supp. 2d 111,

115 (N.D.N.Y. 2000) (prison has a "duty to provide medical services to outgoing prisoner who is receiving continuing treatment at the time of his release for the period of time reasonably necessary for him to obtain treatment 'on his own behalf,'" which could have included forwarding medical records to another provider and facilitating performance of medical procedure there). As of May 2017, a prisoner being discharged from the Jail would be given between 3 and 30 days of medication, depending on how much was left on his latest refill. While some quantities within that range are adequate in the circumstances, others are too low to fulfill the Jail's constitutional obligation. Moreover, the quantity of medication the Jail gives a prisoner is random; the Jail does not determine the quantity based on the date of the prisoner's scheduled appointment with an outside mental health provider or diagnosis. Instead, the Jail relies on the day of the month the prisoner is released and how much medication remains on their monthly medication pack.

> c.   *Inadequate Medication Administration and Psychotherapy*

The Jail does not provide adequate mental health treatment services to prisoners, failing to provide adequate medication management and therapy sessions. As discussed in section IV.A.2.c *supra*, the Jail fails to adequately administer medications to prisoners by failing to order the appropriate medications in a timely manner, failing to accurately deliver medications to prisoners on lockdown status, and failing to administer correct dosages to prisoners. Psychotropic medications are distributed via the same process as non-psychotropic medications, so the problems that plague the Jail's general medication administration procedures, *see* IV.A.2.c *supra*, apply equally to those prisoners on the mental health caseload who receive psychotropic medications, often with deleterious consequences.

The Jail provides little to no psychotherapy. As reported by the Jail's mental health provider, from January to December 2016, the Jail conducted no individual therapy sessions and no group therapy sessions for the hundreds of inmates suffering from mental illness. By June 2017, there was no significant improvement, as the Jail then reported that no prisoners received individual counseling, only 12 prisoners received group counseling, and only 32 prisoners received substance abuse counseling. There were no programs held specifically for women.

The Jail has been increasing its group therapy hours, notably through the extra personnel hired under a grant. The Jail, however, has been slow to ramp up group treatment for prisoners with serious mental illness. In May 2017, the Jail conducted two mental health treatment groups that could accommodate about 25 male prisoners. There were no mental health treatment groups for women. For the quarter ending on June 30, 2017, there were no one-on-one therapy hours, and only 20 hours of group therapy and 10 hours of peer support. The number of group treatment sessions is limited by the number of available staff, and by the rooms available for group therapy sessions. Although most housing pods have a multipurpose room where group sessions can be held, there are no multipurpose rooms in the two pods where the prisoners with the most acute medical and mental health needs are housed. The other available rooms for group sessions can accommodate only 15 people. These rooms, which are outside the housing units, require security staff to transport prisoners to and from the counseling sessions. Like mental

21

health staff, security staff are also in short supply, which limits the number of groups that can be conducted at any one time.

Prisoners in restrictive housing do not have access to group therapy sessions.  The only mental health treatment they receive is individual counseling with mental health staff through a closed cell door.  These limitations on individual counseling for prisoners in restrictive housing are especially troubling given that, for the first six months of 2017, on average, there were 70 prisoners in restrictive housing with serious mental illness daily.  There is no therapeutic environment in which they can speak with mental health counselors.  These cell-front check-ins are insufficient as counseling and do not constitute actual mental-health treatment.  The prisoners we spoke with cited this as one of their primary complaints about the mental health treatment they did receive, stating that due to a lack of privacy, they do not speak candidly with mental health staff because they do not feel comfortable sharing some information in front of the other prisoners in the cell and staff.  The lack of confidentiality undermines the therapeutic utility of these contacts, and contributes to a mental health system that is inadequate for the acutely mentally ill population housed at the Jail.

#### d.   Inadequate Treatment and Supervision of Suicidal Prisoners

The Jail's suicide prevention procedures suffer from serious deficiencies, which put prisoners at serious risk of harm.  One of the most critical components of a minimally adequate mental health treatment program is the "identification, treatment and supervision of inmates with suicidal tendencies."  *Ruiz*, 503 F. Supp. at 1339.  *See also Coleman*, 912 F. Supp. at 1298 n.10.  Most importantly, the Jail's suicide prevention program fails to properly address the risk presented by acutely suicidal prisoners placed on suicide watch.  Currently, prisoners who are acutely suicidal are placed on "constant observation" in a suicide resistant cell.  The cell in which they are placed does not have any blankets, sheets, or bedding.  They are not allowed to take any of their clothing or other items with them when on "constant observation."  Instead, they are issued a mattress and a suicide-resistant smock.

Prisoners on "constant observation" are monitored by a 24-hour camera feed, with physical checks by security personnel every 15 minutes.  This camera monitoring is inadequate to address the risk presented by prisoners who are presenting an imminent risk of harm to themselves.  First, camera monitoring is insufficient because of the unreliability of the Jail's surveillance cameras.  The camera system has been failing in recent months, and there is no record of how often the cameras fail, or where.  During one week in August 2017, the Jail found that 65 of its 500 cameras were not working and stated that "this is a consistent problem."  Second, cameras are monitored by the pod officer and the officers in the command center, where 16 different cameras are displayed at once, and are often tasked with watching as many as nine different prisoners.  Third, the "suicide-resistant" cells in which prisoners are placed for constant monitoring have significant blind spots, which are well known to staff and prisoners alike.  In April 2017, MM, who was diagnosed with a personality disorder, engaged in self-harm while on constant suicide watch in a camera cell.  The day after MM was placed in a camera cell, he was found by a security officer to be biting both of his arms and spitting blood on the floor.  The officer observed that MM was biting his arms while leaning his back on the door so he would not

be in plain view of the camera.  This example illustrates the significant danger to which suicidal prisoners in camera cells are exposed.

Prisoners on suicide watch do not routinely interact with the psychiatrist.  Interactions with the psychiatrist are important because he is the only mental health professional who can properly assess whether there are psychotropic interventions that could help alleviate the suicidality.  With over 500 prisoners on his caseload, the psychiatrist does not have enough time to interact regularly with suicidal patients, contributing to the inadequacy of the Jail's mental health program.  This caseload becomes even more difficult to manage now that there is no longer a psychiatrist on site, and treatment is being conducted remotely by a telepsychiatrist.

Moreover, the Jail has a practice of transitioning prisoners from suicide watch directly to restrictive housing, exposing already mentally fragile individuals to harsh and dangerous conditions.  For example, on August 1, 2016, NN voiced suicidal ideation in general population due to being "depressed about court."  The Jail responded by placing her on suicide watch in a restrictive housing cell where she remained for 14 days, even though mental health staff reported that she had "appropriate," rather than suicidal, thinking and that she told them she was not suicidal one day after being placed there.  During these 14 days, there were no documented mental health interventions or treatment plans to address her mental instability.  By placing suicidal prisoners in restrictive housing, the Jail limits their access to therapeutic treatment and fails to provide prisoners with long-term care.  It is important for the Jail to recognize that a proper suicide prevention program will include short- and long-term care that provides meaningful therapeutic contact to mitigate suicide risk.  Collectively, these acts and omissions result in deficient medical care for prisoners.

> 3.  Inadequate Staffing and Poor Facility Design Contribute to Inadequate Mental Health Care

The Jail does not have enough mental health professionals to treat the prisoners on its mental health caseload, including the 500 prisoners who take psychotropic medications, over 200 of whom have been diagnosed with a serious mental illness.  Courts have held that having enough mental health professionals is an essential part of any adequate mental health program.  *See Coleman*, 912 F. Supp. at 1306 (quoting *Balla*, 595 F. Supp. at 1577) (constitutionally adequate mental health care requires "mental health staff in 'sufficient numbers to identify and treat in an individualized manner those treatable inmates suffering from serious mental disorders'").  *See also Brown v. Plata*, 563 U.S. 493, 521 (2013) (noting that mental health treatment can be impeded by lack of adequate correctional staff, who are required to "escort prisoners to medical facilities or bring medical staff to the prisoners").  Historically, the Jail's mental health staffing levels have been grossly inadequate.  From May 2012 to December 2015, the Jail only had 12 weekly psychiatry hours, 2.0 full-time equivalent (FTE) mental health counselors and 1.0 FTE psychiatric nurse practitioner.  There was no mental health professional present on the weekends.  At the beginning of CCS's contract in January 2016, there were a total of 4.8 mental health staff provided for in the staffing matrix, which included 1.0 FTE for a psychologist and program director, 0.4 FTE for a psychiatrist, 1.0 FTE for a psychiatric nurse practitioner, and 2.4 FTE for social workers.  However, from the beginning of CCS' contract until July 2016, the Jail did not have a mental health director or a full-time psychologist.  As of March 2017, the Jail had a total of only 6.95 mental health staff and did not have any mental

health professionals working on the weekend.  The Jail has since increased its mental health staffing levels, mostly with the help of the money from a grant, but we look forward to learning whether those positions will remain funded when the grant expires in 2018.

Though staffing levels have increased recently, the current levels are still not adequate to meet the needs of the Jail's acute population.  The American Psychiatric Association recommends one FTE psychiatrist for every 75-100 prisoners with serious mental illness.  The Jail currently has approximately 260 prisoners with serious mental illness, and only contracts for one psychiatrist, who now practices telemedicine.  The Jail itself recognizes that the current number of medical and mental health professionals is inadequate and does not meet the Virginia Compensation Board's minimum staffing standards.  The Jail requested funding for an additional 23 medical and mental health treatment positions for fiscal year 2018.

One of the biggest current shortfalls in the Jail's mental health staffing has been the paucity of psychiatry hours.  The following are illustrative examples of the resulting harm:

- OO, a 34-year-old prisoner, gave birth to her first child on February 4, 2017.  On February 9, a staff referral form noted that she was in urgent need of mental health treatment because she was actively sobbing and asking to speak to someone for post-partum depression and missing her baby.  This request was repeated to a mental health professional ten days post-partum, during her behavioral health initial evaluation.  During our visit to the Jail in late March 2017, OO told us she had not gotten any mental health services since the birth of her child and that she could not sleep.  She reported that prior to coming to Jail, she was taking an anti-depressant and an anti-anxiety medication.  She also reported to us that a week and a half prior to our visit, a nurse saw her crying and told OO she was on a list to be seen by mental health, but she had still not seen anyone.  On March 2, a mental health professional referred her to a psychiatrist for evaluation due to her high anxiety, depression, and "racing thoughts."  She was released for time served on April 3, 2017, without seeing a psychiatrist for her post-partum depression.

- PP, a 54-year-old with a history of major depression, was transferred to the Jail on February 19, 2015.  On April 1, PP filed a grievance stating that he had requested to see a psychiatrist because his medicine was not working and he was having anxiety attacks at night, but had "been put off on several occasions."  The next day, a security supervisor confronted PP about a letter he wrote to a female prisoner at another facility.  In the letter, PP said that he was previously under the care of a psychiatrist, but had not yet seen one at the Jail.  He said that sitting in the Jail "was not good or safe" for him (he wanted to work and to go outside).  He complained about feeling threatened by other prisoners and stated that he was "trying to avoid a bad situation" which he felt was "about to get very serious."  He then told the supervisor that in his letter, he was referring to a mental health issue that was not being addressed.  Though the supervisor agreed to refer PP to a mental health professional, she also wrote him up for having contraband in his cell, for which he was placed in restrictive housing.  Prior to his placement in restrictive housing, he did not receive any mental health evaluation.  He complained about his medications not working and asked to see a psychiatrist.  He was told by the social worker that he had been scheduled for "an initial assessment" with a mental health nurse practitioner.  Later that day, on April 3, he was found hanging in his cell.  Despite a history of serious mental

24

illness, he did not see a psychiatrist during the nearly two months between his admission and his suicide. The only evaluation he received was by a social worker on the morning of his death.

From December 2015, when CCS replaced the Jail's previous mental health provider, through March 2017, there were two full-time mental health professionals and two part-time psychiatrists to treat the approximately 500 prisoners on psychotropic medications. CCS's contract provides for 36 hours of psychiatry services per week, but there were periods under the CCS contract when only 16 hours per week were actually provided. In order to fill the gaps in psychiatry services due to an insufficient number of professionals on site, the Jail used telepsychiatrists, who interviewed prisoners via television screens wheeled cell side onto the units, in earshot of other prisoners.

The Jail hired a 0.9 FTE psychiatrist to work on site starting in March 2017 because it believed that the acuity of its serious mental illness population demanded a direct interaction between the prisoner and the provider. But this sole psychiatrist does not have enough time to complete the most basic task of renewing mental health medications for the prisoners who receive them. The psychiatrist is supposed to renew medications every 90 days but has often been unable to personally see every prisoner in that time frame to renew their medication.[8] Because the psychiatrist does not have enough time to renew medications, a registered nurse, who is not licensed to prescribe medication, has been renewing the medications in the computer in order to avoid expiration and a lapse in the prisoners receiving their prescriptions. This is not a safe practice – medications should not be renewed without an appropriate follow-up with a prescribing professional. Many of these medications might need to be changed or the dosage altered, but that is not happening in the absence of adequate and deliberate follow-up by the prescriber. This practice can increase the risk of noncompliance with medication and the emergence of symptoms because there is inadequate follow-up with the prescriber, who can address questions and concerns about the medication. These concerns are amplified given that the Jail's only on-site psychiatrist quit in September 2017 and was replaced by one telepsychiatrist.

The Jail's psychologist/mental health director is similarly stretched thin, such that she is not able to perform all of her duties. She provided us with a list of her duties, which included 35 bulleted items, many of which were to be completed on a daily basis. Because it is not possible for her to complete all of these tasks by herself, some of them have fallen by the wayside and expose prisoners to the substantial risk of harm. For example, as mental health director, she would ordinarily supervise the clinical decisions made by her staff, discuss difficult cases with them, and brainstorm treatment options. She currently does not engage in any of these duties because she does not have the time. Moreover, as director of the program, she should be focusing on engaging in more supervisory tasks and providing programmatic direction for the

---

[8] For example, during the week of our tour, the psychiatrist was scheduled to see 43 prisoners. Of these prisoners, he was not able to see nine of them, or approximately 20% of the prisoners on his list. As of the end of March 2017, the psychiatrist had a list of 241 prisoners who had appointments in the month of March, but who had not been seen by the psychiatrist. As of May 23, 2017, the oldest outstanding appointment on the psychiatrist's waiting list was a prisoner who was supposed to have been seen on April 23, a month earlier.

**C. The Jail's Use of Prolonged Restrictive Housing Under Current Conditions, Including the Failure to Provide Adequate Medical and Mental Health Care, Violates the Constitutional Rights of Prisoners with Serious Mental Illness**

The Jail's pattern or practice of using restrictive housing under current conditions— including the duration and frequency of restrictive housing, the deprivation of human interaction, and the failure to provide adequate medical and mental health care—places prisoners at a substantial risk of serious harm. There is reasonable cause to believe that the combination of current conditions and the Jail's use of restrictive housing for prisoners with serious mental illness violates their rights under the Eighth and Fourteenth Amendments. *See Sweet*, 529 F.2d at 861 (noting that the "cumulative effect of several conditions will bring solitary confinement within the prohibitions of the [E]ighth [A]mendment").

1. Prisoners with Serious Mental Illness Are Subjected to a Substantial Risk of Serious Harm as a Result of the Jail's Use of Prolonged Restrictive Housing

The Jail's practice of subjecting prisoners with serious mental illness to prolonged periods of restrictive housing under conditions, including the denial of access to adequate medical and mental health care, that places these prisoners at substantial risk of serious harm shows deliberate indifference to their health and safety.[9] *See Palakovic v. Wetzel*, 854 F.3d 209, 216-17, 226, 230 (3d Cir. 2017) (holding that a prisoner with serious mental illness who was held in a 100 square foot restrictive housing cell 23 hours during the week and 24 hours during the weekend for "multiple 30-day stints," and who received only mental health interviews through his cell door slot stated a plausible Eighth Amendment claim "in light of the increasingly obvious reality that extended stays in solitary confinement can cause serious damage to mental health"). The Third Circuit has acknowledged the "robust body of legal and scientific authority recognizing the devastating mental health consequences caused by long-term isolation in solitary confinement," including "anxiety, panic, paranoia, depression, post-traumatic stress disorder, psychosis, and even a disintegration of the basic sense of self-identity," as well as physical harm such as "suicide and self-mutilation." *Id.* at 225-26.

Similarly, in 2017, the U.S. District Court for the Western District of Virginia held that a prisoner who recently had been suicidal stated a plausible Eighth Amendment claim when he alleged that he was held in a restrictive housing cell for 23 to 24 hours a day without reading materials or other stimuli for a three and half month stint, a two and half month stint, and a two-week stint over an eight-month period. *Latson v. Clarke*, 249 F. Supp. 3d 838, 845-48 (W.D. Va.

---

[9] The Fourth Circuit has not addressed the constitutionality of conditions similar to those in Hampton Roads Regional Jail. *But see Incumaa v. Stirling*, 791 F.3d 517, 534 (4th Cir. 2015) (distinguishable because the prisoner had been in solitary confinement for 20 years, but favorably citing Justice Kennedy's concurrence in *Davis v. Ayala*, —— U.S. ——, 135 S. Ct. 2187, 2194-95 (2015) for the proposition that "[p]rolonged solitary confinement exacts a heavy psychological toll that often continues to plague an inmate's mind even after he is resocialized"); *In re Long Term Administrative Segregation of Inmates Designated as Five Percenters*, 174 F.3d 464, 466-68 (4th Cir. 1999) (distinguishable because prisoners did not have serious mental illness); *Williams v. Branker*, 462 F. App'x 348 (4th Cir. 2012) (unpublished) (distinguishable because the prisoner did not allege that he was subjected to serious harm or that he was denied adequate mental health care as a result of the restrictive housing).

2017).  The court noted that "[r]esearch has shown that the impacts of solitary confinement can be similar to those of torture and can include a variety of negative physiological and psychological reactions [and that t]hese effects are amplified in individuals with mental illness and can exacerbate underlying conditions . . . ."[10]  *Id.* at 847.  The court concluded: "It is plausible that the alleged conditions combined to deprive [the prisoner] of the single, identifiable human need of mental health and sanity."  *Id.* at 860.[11]

About a quarter of the Jail's 774 cells are designated as restrictive housing cells. Prisoners at the Jail can be placed in restrictive housing for three reasons:  (1) administrative restriction; (2) disciplinary restriction; or (3) protective custody.  Despite minor differences between those statuses, the experience of the prisoners is essentially the same.  In these cells, a prisoner is housed alone, typically for 22 or more hours per day during the week and even longer on weekends.[12]  The cells are 80 square feet and most have a metal sink and toilet, a metal desk and stool, and a metal bed frame with a mattress (although six cells do not have beds at all). Each cell has a horizontal window near the ceiling, roughly six inches tall and forty-five inches wide, which faces outside but is covered with an opaque film to allow light in but to prohibit prisoners from seeing outside.  The cells have solid metal doors with narrow slots at waist level, wide enough for food trays to pass through, and small foggy, plexiglass windows facing into the housing unit's common area.

During the first six months of 2017, a daily average of 70 prisoners with serious mental illness were held in restrictive housing.  This accounts for 47% of prisoners held there.  Of the 496 prisoners the Jail identified as having serious mental illness between July 2016 and July 2017,[13] 67% had spent some time in restrictive housing, and 36% had spent more than a month consecutively in restrictive housing.  Sixty-three of those prisoners spent three consecutive months or more in restrictive housing; 25 spent six consecutive months or more; and four spent more than a year consecutively.

---

[10] *See also Porter v. Clarke*, 290 F. Supp. 3d 518, 531-32 (E.D. Va. 2018) (distinguishable because prisoners were on death row for more than six years, nonetheless recognizing the "large and growing body of literature—both academic and legal—discussing the potentially devastating effects of prolonged periods of isolation").

[11] *See also Ind. Prot. & Advocacy Servs. Comm'n v. Comm'r, Ind. Dep't of Corr.*, No. 08-cv-01317, 2012 WL 6738517, at *3-6, *12, *15, *17, *23 (S.D. Ind. Dec. 31, 2012) (following a bench trial, finding that the "conditions in the segregation units [in Indiana's prisons] cause[d] a predictable deterioration of the mental health of seriously mentally ill prisoners" and holding that those conditions and the failure to provide adequate treatment for those prisoners, violated the Eighth Amendment) (prisoners with serious mental illness were held in 80 square foot cells for approximately 23 hours a day for between three and six months, and in some case up to a year, with limited reading materials – though some could purchase a radio or a television – and had mental health treatment often only through medication or responses to incidents of actual self-harm); *Restrictive Housing Report*, at 99 (recommending that "[g]enerally, inmates with serious mental illness should not be placed in restrictive housing").

[12] *See also Davis v. Ayala*, —— U.S. ——, 135 S. Ct. 2187, 2208 (2015) (Kennedy, J., concurring) (referring to the "usual pattern" of solitary confinement as being housed in "a windowless cell no larger than a typical parking spot for 23 hours a day; and in the one hour when [a prisoner] leaves it, he is allowed little or no opportunity for conversation or interaction with anyone").

[13] The Jail's mental health staff had been diagnosing prisoners with serious mental illness prior to July 2016, but only began tracking them in a way that could be easily cross-referenced with restrictive housing stays in July 2016.

Prisoners with serious mental illness are not, for the most part, spending long periods of time in restrictive housing because of disciplinary infractions. During the first half of 2017, 73 prisoners with serious mental illness spent only 12 days on average on disciplinary status (ranging from 1 to 84 days) in restrictive housing, while 186 prisoners with serious mental illness spent more than 40 days on average on administrative status (ranging from 1 to 429 days). The Jail places prisoners in restrictive housing for administrative reasons because the Jail is not providing adequate mental health treatment to address prisoners' mental health needs while they are in general population. When these prisoners are unable to function in the general population because of their unmet mental health needs, the Jail sends them to restrictive housing on administrative status. We saw many examples of prisoners being transferred from general population to restrictive housing on administrative restriction, sometimes with a status of "administrative restriction - mental deficient" or "administrative restriction - unable to adapt." Similarly, a prisoner might serve a short stay in restrictive housing for disciplinary time but then be held in restrictive housing for longer periods of time in administrative restriction. Below are two examples:

- On March 16, 2017, QQ, diagnosed by the Jail with schizoaffective disorder, was placed in restrictive housing under "Administrative Restriction – Mental Deficient" where he remained for the next 78 days until being transferred to a state psychiatric hospital. He was placed in restrictive housing after reportedly making sexually inappropriate comments to an officer. Seven months earlier, the Jail's mental health clinician observed that QQ was "very disoriented and disheveled," and was "guarded and appear[ed] to be paranoid" during a mental health evaluation. Also, the clinician reported that QQ's current mental health issues were: "Sleeping 2 hrs in a day, loss of energy … fogginess, [and] inmate also report[s] that he is sometime[s] over excited, laughing a lot, angry, crying for no reason, increase[d] mood swings, distractible, poor concentration and focus." About two weeks later, on September 2, 2016, a court released him from the Jail. On March 15, 2017, QQ was admitted back to the Jail, where the next day he was placed in restrictive housing under "Administrative Restriction – Mental Deficient." While he was in restrictive housing during the next 78 days, a community case worker visited him in preparation for an upcoming court hearing and told the Jail that he should be reevaluated because of concerns about his mental health status. This prompted a Jail mental health clinician to reevaluate him on April 13, 2017. The notes of that evaluation stated possible deterioration of his mental health in which he "displayed inappropriate laughing [and the] pod officer reported that he can be quick to anger." Despite this, QQ remained in restrictive housing for another 50 days, until the Jail transferred him to a state psychiatric hospital.

- On January 13, 2017, RR, diagnosed by the Jail with schizoaffective disorder, was placed in restrictive housing for a disciplinary infraction for failing to obey an order, where he stayed for 10 days until his status changed to administrative restriction, where he stayed for more than 250 days. After being on administrative restriction for more than six months, on July 21, 2017, he filed a sick call request to move to the Jail's mental health pod which was approved by a Jail mental health clinician on August 7, 2017. Yet, he was still in restrictive housing as of our last visit to the Jail on October 20, 2017.

In addition to being subjected to the physical conditions described above for prolonged periods of time, prisoners with serious mental illness in restrictive housing do not receive adequate mental health care. They do not receive meaningful out-of-cell activities, such as confidential individual and group therapy, and peer or other counseling, as well as unstructured activities such as socializing with peers and eating out of their cells. Indeed, the Jail's mental health staff expressed that they have extreme difficulty in accessing prisoners in the restrictive housing units. Prisoners there are very rarely able to have an out-of-cell, confidential treatment session. Instead, any face-to-face contact mental health staff have with prisoners in restrictive housing consists of walking to each cell and asking how the person is doing and whether they have any issues through a crack at the hinge of the solid metal door, which has led prisoners to refer to it as "crack therapy." These conversations are often in the presence of corrections officers who are required by policy to escort mental health staff during their rounds, thus making it difficult to have confidential conversations. These practices hinder mental health staff's ability to adequately identify and monitor prisoners with acute symptoms in need of intervention.

Moreover, mental health staff often cannot complete or even start their rounds because of the lack of security staff or the occurrence of another jail task on the restrictive housing units, such as pill pass, laundry, commissary, meal time, quiet time, or count time. Mental health staff members told us that they sometimes have to return to these units multiple times a day to find a brief period when they can round, and that some days these impediments completely block them from seeing anyone. One experienced mental health staff member's biggest barrier to providing treatment to prisoners in restrictive housing was not being able to consistently meet with them in a private setting outside their cell.

Systemic deficiencies contribute to the Jail's overreliance on and inappropriate use of restricting housing as a means of controlling its prisoners with serious mental illness. Those deficiencies include inadequacies in its mental health program, a system-wide marginalization of the concerns of mental health staff, deficiencies in security operations, and ineffective oversight mechanisms for assessing the risk restrictive housing poses to prisoners with serious mental illness.

*Inadequate Mental Health Care:* In section IV.B *supra*, we describe the mental health deficiencies at the Jail. These deficiencies contribute to the Jail's use of restrictive housing because the Jail's inability to provide adequate mental health treatment, programming, and medication management further exacerbates prisoners' mental health issues. The Jail's lack of other resources to manage this population safely results in the Jail resorting to placing prisoners in restrictive housing on administrative status.

*Marginalized Mental Health Staff:* We heard repeatedly from mental health staff that restrictive housing was harming prisoners at the Jail. As an alternative, mental health staff have proposed the creation of smaller units for those prisoners with serious mental illness, but more mental health and security staff would be needed to cover these units, which the Jail currently does not have. In addition, mental health staff are not given the support that they need to effectively address the mental health needs of prisoners in restrictive housing with serious mental illness. They are not offered a therapeutic environment in which to treat prisoners in restrictive

30

housing, instead having to speak to patients through a crack between the metal door and the wall or in a multi-purpose room on the unit, without any privacy.

*Deficient Security Operations:* As described more fully in section IV.B.3 *supra*, a lack of security staff contributes to the Jail's inadequate provision of mental health services and its overreliance on restrictive housing. Additionally, due to the lack of security staff to serve as escorts, mental health staff are not able to conduct their regular rounds to check on the over 200 prisoners in restrictive housing. Escorting mental health staff to conduct their rounds in restrictive housing is deprioritized by security staff in favor of their other duties, like taking prisoners to recreation and ensuring that they all receive showers. While recreation and prisoner hygiene are important, so too is their mental health care, especially for those prisoners in restrictive housing with serious mental illness.

*Ineffective Oversight:* The Jail does not aggregate or analyze the data it keeps on the number of prisoners with serious mental illness being held in restrictive housing, nor their length of stay there, nor the number of repeated placements there. This absence of data analysis impedes the Jail's ability to connect stays in restrictive housing to incidents of harm and mental health deterioration. The Jail also does not aggregate or analyze the number of suicide threat or self-inflicted injury incidents nor the number of transfers to state psychiatric hospitals to look for correlations between restrictive housing and these incidents or transfers.

The unavailability of access to adequate mental health care is especially harmful for suicidal prisoners. At the Jail, when a prisoner is suicidal, he or she is placed in restrictive housing. Instead of receiving the constitutionally adequate mental health care required in that situation, such as intensive therapeutic interventions, they receive minimal engagement from mental health staff whose interactions are limited and only occur through a crack between the cell door and the wall for a few minutes. Furthermore, Jail staff told us that once prisoners are removed from suicide watch status, they remain in restrictive housing until a classification committee approves their removal, which can take days. Below are a few examples:

- On March 24, 2017, SS, diagnosed by the Jail with bipolar and posttraumatic stress disorders, was released from a restrictive housing cell – eight days after being taken off suicide watch. Staff at the Jail told us that although she was approved to be released from restrictive housing by mental health staff on March 17, the classification committee did not get the paperwork until March 23, and then it took still another day for her to be released.

- On August 1, 2016, NN voiced suicidal ideation in general population due to being "depressed about court." The Jail responded by placing her on suicide watch in a restrictive housing cell where she remained for 14 days, even though mental health staff reported that she had "appropriate," rather than suicidal, thinking and that she told them she was not suicidal one day after being placed there. During these 14 days, there were no documented mental health interventions or treatment plans to address her mental instability.

- On July 3, 2015, TT gave birth at an outside hospital while a prisoner at the Jail. In the hospital room, she gave the nurse a note that said she felt like harming herself due to having to leave the baby behind; when she saw that the nurse had given it to the corrections officer, she told the officer, "I don't want to go behind a door, it's only going to make things worse." The officer then responded, "Be careful what you say to me," implying that the officer would have to place TT on suicide watch if needed. TT responded, "This is getting to me I'm very depressed." When she returned to the Jail, she was placed in a suicide cell and kept in restrictive housing for a week.

Juveniles under the age of 18 with serious mental illness are also held in restrictive housing at the Jail.[14] UU was one of those youth. He was admitted to the Jail on February 19, 2016, when he was 16 years old, and was diagnosed by the Jail with schizoaffective disorder. Since then, and up until his 18th birthday in March 2017, he spent a total of 185 days in restrictive housing, all on administrative status, in stints of 70, 100, and 15 consecutive days. During one stretch where he had been in restrictive housing for 50 consecutive days, he wrote a sick call request for "really bad migraines from [his] mental issues" and stated, "I really need help please." Eighteen days later, he again wrote a sick call request for vomiting as a result of his migraine. A month since his initial request and 81 days into this particular restrictive housing stint, he met with the corporate medical director by videoconference. He reported to the medical director that he has auditory and visual hallucinations that tell him to hurt people, bring on migraines that make him want to throw up, and make it hard for him to sleep. According to the medical director's notes, he also stated, "I've been in the hole [restrictive housing] for 3 months and I've been asking to see someone but I never got to see anyone." After this visit, he remained in restrictive housing for 19 more consecutive days with mental health notes continuing to report that he was having auditory hallucinations.

Still other prisoners are placed in restrictive housing because they do not feel safe in general population, sometimes because of their vulnerability connected to their serious mental illness. One such prisoner, VV, was given a status of "PC-MH," indicating that her protective custody was mental health related. She was held in restrictive housing for 75 days between May and July 2017. In 2017, eight prisoners with serious mental illness in protective custody had been there for more than 200 days, including the following:

- As of August 2017, WW, diagnosed with generalized anxiety disorder and labeled by the Jail as having serious mental illness, had been in restrictive housing under protective custody status for more than two years.

---

[14] The Jail currently houses juveniles under the age of 18 if they have been charged as adults. Over the course of our investigation, there were no special housing accommodations for juveniles who are housed alongside adults. Juveniles were not separated by sight and sound from adult prisoners, in violation of the Prison Rape Elimination Act, 42 U.S.C. § 15601, et seq. Recently, we received word that the Jail will begin holding juveniles in a housing unit separate from adults. Because of this, we are not making specific conclusions regarding the treatment of juveniles at the Jail. However, should the Jail not follow through on its plan to house juveniles separate from adults, we may specifically address the treatment of juveniles in the Jail.

- As of June 2017, XX, diagnosed by the Jail with recurrent major depression with psychosis, had been in restrictive housing under protective custody status for more than 400 days.

In sum, the Jail's placement of prisoners with serious mental illness in prolonged restrictive housing under current conditions, including the denial of access to adequate medical and mental health care, exposes them to a substantial risk of serious harm.

2.   Prisoners with Serious Mental Illness Have Suffered Serious Harm as a Result of the Jail's Use of Restrictive Housing Under Current Conditions

Prisoners with serious mental illness at the Jail are subjected not only to a substantial *risk* of serious harm in its restrictive housing cells, but also to *actual* serious harm following periods of restrictive housing.  Of the three prisoners with serious mental illness who committed suicide at the Jail since 2015, two committed suicide while in restrictive housing (PP and YY) and another, JJ, had spent 69 of his first 76 days at the Jail in restrictive housing before hanging himself 17 days after being released from restrictive housing.  In 2015, two additional prisoners with serious mental illness died in restrictive housing:  On August 19, 2015, AA, diagnosed with a history of schizophrenia, schizoaffective and psychotic disorders, died of heart failure as a result of rapid weight loss after spending his entire 100 days at the Jail in restrictive housing; and, on April 7, 2015, EE, who was described by the Jail as "actively psychotic," died from complications due to a duodenal ulcer in restrictive housing, where he had been for five days.  In 2016, a prisoner with serious mental illness, ZZ, who was diagnosed with bipolar disorder and depression, died one day after the Jail transferred her to a state hospital and after she had spent all of her eight-day-stay at the Jail in restrictive housing.  In May 2018, another prisoner, AB, who was 18 years old and diagnosed with schizophrenia, died in restrictive housing.

Other prisoners have experienced serious mental harm in restrictive housing at the Jail to the point of threatening suicide or inflicting injury on themselves.  In fact, a majority of suicide threats and self-harm incidents occur in the Jail's restrictive housing cells.  Though approximately 15% of the Jail's total population is housed in one of its restrictive housing cells, between January 1, 2014 and December 31, 2016, more than 65% of the nearly 300 "suicide threat" incidents and more than 60% of the 250 "self-inflicted injury" incidents occurred in a restrictive housing cell.  During the first eight months of 2017, 53% of both the 115 "suicide threat" incidents and the 40 "self-inflicted injury" incidents occurred in a restrictive housing cell, including the following examples:

- On August 7, 2017, AC, diagnosed by the Jail with bipolar disorder and schizophrenia, was found in her restrictive housing cell trying to reopen wounds on her arms to make them bleed.  She had been on suicide watch there since July 22.  This was her fourth documented suicide threat or self-inflicted injury incident in two weeks.  Initially, on July 22 she was placed in restrictive housing on suicide watch for scratching her arm to make herself bleed and after telling a jail nurse that she was depressed.  On July 29, she told officers that "the voices in my head are telling me to hurt myself" and explained to a medical staff member that she was feeling this way because today was her son's birthday, she was raped by her father, and her son was her father's child.  This incident report

33

states that a mental health referral was made after this.  Yet, she remained in a restrictive housing cell and the following day, July 30, she was again found cutting her arms.  She told Jail staff that she was hallucinating and the voices were telling her to harm herself. She was assessed by medical and placed back in her restrictive housing cell where a week later, on August 7, she was found again trying to reopen the wounds on her arms.

- On July 30, 2017, AD, diagnosed by the Jail with major depression, tied a string around his neck, threatening suicide while in restrictive housing.  This was his eleventh suicide threat incident since entering the Jail a year earlier.  Each one occurred in restrictive housing.  A suicide threat in December 2016, in which AD tied a sheet around his neck and attempted to secure it to a sprinkler head, resulted in an officer deploying pepper spray in his cell.  Another suicide threat, in April 2017 was followed by the Jail petitioning to have him involuntarily committed to a state psychiatric hospital, where he stayed for nine days until returning to the Jail on April 25.  Twelve days later, he was placed back into restrictive housing for a month.

- On May 2, 2017, AE, diagnosed by the Jail with schizoaffective disorder, was found in his restrictive housing cell lying on his bed nonresponsive with a towel tied around his head covering his eyes.  He told jail staff who found him that he had tried to kill himself with a noose "a few minutes ago but it hurt too much" and that he tried to do it because "I can't take being in seg no more."  This was his seventh suicide threat incident since February 2017.  Each one occurred in restrictive housing.

- On February 15, 2017, AF, diagnosed by the Jail with schizoaffective disorder, told officers that he had inserted an ink pen in his arm while in restrictive housing.  When we met AF in March 2017, he told us that he has a history of sticking ink pens in his arms or self-inflicting other harm to his body, including banging his head against the walls of his cell.  He is known as "hammerhead" at the Jail because he has a large welt on his forehead from the years of banging his head on the walls while at the Jail.  He also told us he was doing better because he was no longer in restrictive housing and that it helps him to deal with his mental issues when he can talk with a mental health staff person.  Jail records revealed that he had been in the Jail at least five times since 2012; that the Jail had transferred him three times to a state psychiatric hospital; and that he had spent nearly 800 of his nearly 1100 days in the Jail in restrictive housing.

- On January 10, 2017, LL, diagnosed by the Jail with bipolar disorder, threatened to kill himself while in restrictive housing after tying a sheet around his face, standing on his toilet, and then attempting to break the sprinkler head.  After LL failed to heed a jail officer's order to stop, the officer deployed pepper spray into his cell.  A nursing note recorded that he was "seen in cell after being sprayed with OC spray face down on the floor kicking and screaming [that] he was going to kill himself."  He had been in the Jail since November 15, 2016 and in restrictive housing for all but nine of those days.  On December 22, 2016, a mental health staff member recommended that he be removed from restrictive housing, and he was removed, six days later on December 28th.  Then on January 3, 2017, he was again placed in restrictive housing under a "mental deficient" classification.  Then a week later, on January 10, he threatened to kill himself.

34

Another indicator of a prisoner's mental health deteriorating is when the Jail transfers a prisoner to a state psychiatric hospital to receive a higher level of mental health treatment. These transfers indicate that a prisoner's mental health has gotten so bad that the Jail is not capable of providing the needed care. In 2016, there were 169 transfers from the Jail to a state psychiatric hospital. Of those prisoners transferred, more than 60% were housed in restrictive housing immediately prior to being transferred. More than half of those prisoners had been in restrictive housing for more than 30 consecutive days. Similarly, during the first eight months of 2017, 55% of the 133 transfers were of prisoners who were in restrictive housing immediately prior to being transferred and nearly half of those prisoners had spent 30 consecutive days or more in restrictive housing immediately prior to being transferred. Below are a few examples:

- On February 7, 2017, AG, diagnosed with bipolar disorder, was transferred directly from restrictive housing to a state psychiatric hospital, after swallowing a sharp object. This was the second time in a month that he was transferred directly from restrictive housing to a state psychiatric hospital. Between August 9, 2016 and January 5, 2017, he was held in restrictive housing under a "mental deficient" classification. During that time, he swallowed harmful objects five different times, and was generally observed to have a "significant history of self-mutilation and suicidal ideation." On January 5, 2017, the Jail transferred him to a state psychiatric hospital. When he returned from the state psychiatric hospital on January 19, 2017, he was again placed in restrictive housing. When he returned from the state psychiatric hospital on February 27, 2017, he was immediately placed on suicide watch in restrictive housing.

- On November 10, 2016, AH, diagnosed by the Jail with schizophrenia and schizoaffective disorder, was transferred from the Jail to a state psychiatric hospital for the second time in less than five months. She spent her entire time at the Jail in restrictive housing. When first admitted to the Jail on June 22, 2016, she expressed homicidal tendencies, stating that she was not on her medication, feared for her life, and "would like to be placed in solitary." She was placed in restrictive housing that day because mental health staff recommended it pending further evaluation. In the days that followed, she was observed by mental health staff to be "agitated" and "would not engage" during cell-side rounds in restrictive housing. Three days later, on June 29, 2016, the Jail's records show that a mental health assessment was no longer needed because the Jail had assessed her in April 2016 on a previous admission. During the following 10 days, she refused to let the Jail take her vital signs, and reportedly was seen throwing her cup "in an aggressive manner" at the cell window. Five days later, on July 14, 2016, and 22 days after being placed in restrictive housing, AH was transferred to a state psychiatric hospital for more than a month. The hospital discharged her to the Jail, stating that she was competent and should "follow up with [a community mental health] treatment plan." When back from the state hospital, in the Jail's intake area, AH began throwing shoes and other belongings at officers and was subsequently placed into restrictive housing for "erratic behavior" pending a mental health evaluation, where she stayed for the next two months, until she was again transferred back to the state psychiatric hospital.

35

- On June 1, 2016, AI, who has a history of mental health issues and taking antipsychotic medications, was transferred from the Jail to a state psychiatric hospital directly from restrictive housing. This was the fourth time in less than 10 years that the Jail had transferred him to a state psychiatric hospital. Since 2007, he has spent more than 600 days at the Jail and at least 155 days at the state hospital, stemming from four arrests, all on trespassing charges.

Moreover, prisoners waiting for transfer to a state psychiatric hospital are often kept in restrictive housing, resulting in further mental health deterioration. As described in section III, AA died in restrictive housing in August 2015 while waiting to be transferred to a state psychiatric hospital. More recently on April 4, 2017, AJ was transferred to a state psychiatric hospital 35 days after a judge's February 28th Order that AJ be transferred to a higher level of care. AJ was held in restrictive housing for 28 of those 35 days, but prior to the judge's order he had already been in restrictive housing since December 30, 2016. This means AJ was held in restrictive housing for 88 of the 95 days before being sent to a state hospital. In January 2017, he was observed "slapping and punching" himself and showing signs of "psychotic thinking," according to a mental health professional. By mid-March, another mental health professional noted "paranoid delusional statements" made by AJ, further noting that medications for AJ had been discontinued months prior as a result of his multiple treatment refusals. Collectively, these examples demonstrate that the Jail's restrictive housing practices contribute to inadequate medical care.

### 3. Officials at the Jail Knew of the Substantial Risk of Serious Harm and Disregarded It

The death of AA in August 2015 put Jail officials on notice of some of the risks that prolonged restrictive housing posed to prisoners with serious mental illness, such as further mental health deterioration and rapid weight loss, as described in section III *supra*. *See Hope*, 536 U.S. at 738-35 (disregarding an obvious risk to prisoner health and safety shows deliberate indifference); *see also Palakovic*, 854 F.3d at 226 (finding that it is an "obvious reality that extended stays in solitary confinement can cause serious damage to mental health"). Yet, the Jail has failed to take steps to eliminate these and other inadequacies, evincing deliberate indifference to prisoner health and safety. The Jail continues to place prisoners with serious mental illness in restrictive housing under current conditions with tragic consequences, like those suffered by YY and JJ in 2017. *See* IV.C.2 *supra*. These deaths, coupled with the Jail's failure to analyze the data it keeps on the length of time prisoners with serious mental illness spend in restrictive housing, indicate that the Jail knows of the risks and has failed to address them.

### D. The Jail's Use of Restrictive Housing on Prisoners with Mental Health Disabilities Violates the Americans with Disabilities Act

By placing prisoners with mental health disabilities (*i.e.*, mental illness) in restrictive housing because of their disability when they would otherwise be qualified to be in non-restrictive housing (e.g., general population, mental health unit), the Jail violates Title II of the ADA. The Jail places some prisoners who have been examined by mental health staff and have difficulty interacting with others due to limited comprehension and communication skills in

restrictive housing on a status of "Administrative Restriction – Mentally Deficient."  These prisoners have a qualifying disability and are placed in restrictive housing by reason of their disability in violation of the ADA.  *See Latson*, 249 F. Supp. 3d at 856-57 (denying a motion to dismiss a prisoner's ADA claim that prison officials discriminated against him on the basis of his mental health disabilities by placing him in restrictive housing for symptoms of his disabilities without a reasonable modification, and by denying him access to benefits while in restrictive housing).

Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."  42 U.S.C. § 12132.[15]  To establish a Title II claim, one "must allege that (1) [he] has a disability, (2) [he] is otherwise qualified to receive the benefits of a public service, program, or activity, and (3) [he] was excluded from participation in or denied the benefits of such service, program, or activity, or otherwise discriminated against, on the basis of [his] disability."  *Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 498 (4th Cir. 2005); *see also Pa. Dep't of Corr. v. Yeskey*, 524 U.S. 206, 209-10 (1998) (applying Title II in the prison context).  The ADA offers the same protections to prisoners with disabilities whether those disabilities stem from physical or mental impairments.  42 U.S.C. § 12102.  Thus, prisoners at the Jail with mental illness are entitled to this protection.

The Jail places prisoners with mental health disabilities in restrictive housing on a status of "Administrative Restriction – Mentally Deficient" by reason of their disability.  Such prisoners are placed in restrictive housing due to a decision by a classification officer to allow mental deficiencies to determine their custody status.  Placing a prisoner in restrictive housing on Administrative Restriction – Mentally Deficient is different than placing a prisoner in restrictive housing on Disciplinary Restriction.  Prisoners on Disciplinary Restriction are placed on this status after being found guilty in a hearing of a rule violation and may not be held in restrictive housing for more than 60 days.  Prisoners on Administrative Restriction – Mentally Deficient are not given due process rights, and there is no limit to how long they may be held in restrictive housing on this status.

The Jail does not place every prisoner with mental illness in restrictive housing.  Moreover, the Jail places some prisoners with mental illness in restrictive housing for reasons other than their disability, such as for Disciplinary Restriction.  Such placements for reasons other than the prisoner's disability do not typically violate the ADA.  But the Jail violates the ADA when it places prisoners with a mental illness disability in restrictive housing on Administrative Restriction – Mentally Deficient because such placements are because of the prisoners' disability.

---

[15] Public entities are not required "to permit an individual to participate in or benefit from its services, programs, or activities . . . when that individual poses a direct threat to the safety of others."  28 C.F.R. § 35.139.  A direct threat is "a significant risk to the health or safety of others that cannot be eliminated by a modification of policies, practices, or procedures, or by the provision of auxiliary aids or services."  28 C.F.R. § 35.104.  The Jail cannot avail itself of the direct threat defense because it is placing prisoners in restrictive housing due to their mental deficiency categorization, rather than conducting "an individualized assessment, based on reasonable judgement" with consideration of whether reasonable modifications would "mitigate the risk."  28 C.F.R. § 35.139(b).

Prisoners with mental illness who are being held in restrictive housing on an administrative status of "mentally deficient" are otherwise qualified to be housed in non-restrictive housing and are being placed on this administrative status because of their disability. The Jail's policy provides that the custody status of "mentally deficient" is a sufficient reason to place prisoners in restrictive housing, and these prisoners are held in restrictive housing due to the Jail's classification officer's decision to allow mental deficiencies to determine their custody status. During the first eight months of 2017, 54 prisoners were held in restrictive housing on the sole basis of "Administrative Restriction – Mentally Deficient." Because there is no disciplinary or other reason given for holding these prisoners in restrictive housing, they are otherwise qualified.

Also, prisoners with mental illness who are placed in restrictive housing on the basis of their disability are excluded from structured and unstructured programs and benefits offered to prisoners not in restrictive housing, such as confidential mental health treatment, group mental health treatment, GED or life skills classes, parenting and anger management programs, and re-entry classes, as well as interacting with other prisoners in a common space during meals or day-room time.

To avoid discrimination on the basis of disability, jail officials must "make reasonable modifications in policies, practices, or procedures."[16]  For example, the Jail could provide more comprehensive mental health training for correctional officers, more mental health treatment housing alternatives, or better mental health treatment and strategies to help those prisoners deemed "mentally deficient" rather than placing them in restrictive housing because of their disabilities. *See Brown v. Washington Dep't of Corr.*, No. C13-5367, 2015 WL 4039322, at *11 (W.D. Wash. May 13, 2015), *report and recommendation adopted*, No. C13-05367, 2015 WL 4039270 (W.D. Wash. July 2, 2015) (finding that placing a prisoner in a restraint chair for behavior that is related to his mental illness rather than "accommodating [his] mental illness with appropriate treatment" may indicate a "discriminatory response").

---

[16] The ADA's obligation to make "reasonable modification in policies, practices, or procedures" is not limitless. A modification is not required if it would "fundamentally alter the nature of the service, program, or activity." 28 C.F.R. § 35.130(b)(7). The requested modification here would not "fundamentally alter" the Jails programs. The Jail already offers some services tailored toward prisoners with mental illness: it offers some mental health training for correctional officers, some mental health treatment to prisoners, and some mental health units. In addition, the Jail may "impose legitimate safety requirements necessary for the safe operation of its services, programs, or activities." 28 C.F.R. § 35.130(h). However, those requirements must "be based on actual risks, not on mere speculation, stereotypes, or generalizations about individuals with disabilities." *Id.* Thus, the Jail could provide legitimate safety requirements for holding a prisoner with mental illness in restrictive housing as long as it was not based on speculation, stereotypes, or generalizations about individuals with disabilities.

## V.  MINIMUM REMEDIAL MEASURES

To remedy the constitutional and statutory violations identified in this Notice, we recommend that the Hampton Roads Regional Jail Authority implement, at minimum, the remedial measures listed below.  In listing these remedies, we note that over the course of our investigation, the Jail has been making changes to its personnel, policies, and procedures, to address some of the violations identified in our Notice.

### A.  Medical Care

The Jail should:

1. Revise its policies, procedures, and practices relating to intake, chronic care, continuity of care, sick call, access to medical care by those in restrictive housing, medical grievances, medication refusals, and quality assurance, to ensure that prisoners receive adequate medical care.

2. Increase medical staffing by hiring sufficient additional staff with appropriate credentials (e.g., MDs, RNs, and LPNs) and increasing the hours that current staff with higher credentials are onsite on evenings and weekends to ensure that prisoners receive adequate medical care.

3. Increase security staffing to ensure that there are sufficient staff to escort medical staff during pill pass and during any visits to prisoners in restrictive housing, escort prisoners to the medical clinics for their appointments, transport prisoners to outside medical appointments, and maintain security watch over hospitalized prisoners.

4. Ensure that adequate intake screening and health assessments are provided.

5. Ensure that trained medical care providers review on a daily basis the medical screening information in order to provide prisoners timely access to a physician as is clinically appropriate.

6. Ensure that prisoners' acute and chronic health needs are identified in order to provide adequate medical care.

7. Ensure that prisoners with chronic conditions are routinely seen by a physician as clinically appropriate, to evaluate the status of their health and the effectiveness of the medication administered for their chronic conditions.

8. Ensure that the medical request process for prisoners provides them with adequate access to medical care.  This process should include logging, tracking, and timely responses by medical staff as clinically appropriate, and should include regular audits by Jail staff to ensure compliance with this process.

9.  Ensure that medical and sick call requests are appropriately triaged based upon the seriousness of the medical issue.  Ensure that medical requests submitted in the form of a grievance or through another mechanism are appropriately triaged, even if submitted through improper channels.

10. Provide for physician oversight, including periodic review, of sick call, with nursing protocols and clinical assessment forms that guide the nurses performing sick call.

11. Ensure that prisoners are provided with diagnoses for identified medical problems and that appropriate treatment plans are developed.

12. Provide timely medical appointments, including appointments and hospitalizations outside of the facility.

13. Ensure that prisoners receive treatment that adequately addresses their serious medical needs in a timely and appropriate manner.

14. Ensure that all corrections officers, medical, and mental health staff receive adequate pre-service and annual in-service training on first-responder medical care, mental health and suicide prevention.

15. Conduct timely and adequate multidisciplinary morbidity-mortality reviews for all prisoner deaths, including suicides and serious suicide attempts (*i.e.*, suicide attempts requiring hospitalization).  Ensure the senior Jail staff have access to all such reviews conducted by the Jail's medical or mental health provider.

16. Ensure that the Jail's quality assurance program is adequately maintained and identifies and corrects deficiencies with the medical care system.

**B.   Mental Health Care**

The Jail should:

1.  Ensure that all initial screenings are performed by staff who are trained to identify mental health issues and that appropriate care is taken to accurately record a prisoner's current medications.

2.  Ensure that comprehensive health assessments of all prisoners are conducted within 14 days of their arrival, with a psychiatrist conducting the screening or overseeing RNs who conduct the screening.

3.  Provide immediate treatment to prisoners who are suicidal or psychotic, as soon as those conditions are known to the Jail.  Ensure timely access to mental health professionals when the prisoner is presenting symptoms requiring mental health care.

40

4.  Ensure that all reasonable efforts are made to obtain a prisoner's prior mental health records from prior jail admissions and from community services boards or other community providers. Ensure that this information is incorporated into prisoners' medical charts.

5.  Develop and implement policies and procedures to ensure prisoners with serious mental health needs receive timely treatment as clinically appropriate, in a clinically appropriate setting.

6.  Ensure that appropriate, detailed treatment plans are developed for prisoners with mental health needs and implement procedures whereby treatment plans are regularly reviewed to ensure they are being followed.

7.  Ensure that all prisoners with serious mental health needs receive regular, consistent therapy and counseling, in group and individual settings, as clinically appropriate.

8.  Ensure an inpatient level of care is available to all prisoners who need it, including regular, consistent therapy and counseling, as clinically appropriate.

9.  Ensure that conversations between mental health professionals and prisoners can be conducted in a confidential setting to allow for effective information sharing and treatment.

10. Provide adequate psychiatry coverage and psychiatry support staff in order to timely address prisoners' serious mental health needs.

11. Ensure that the psychiatrist conducts follow-up assessments, as clinically appropriate, with prisoners on any new psychotropic medications or change in medication dosage.

12. Ensure that psychotropic medications are ordered in a timely manner, are accurately delivered to prisoners on lockdown status, and are administered to prisoners in the correct dosages.

13. Ensure that medication administration records are regularly audited by Jail staff for completeness and accuracy.

14. Ensure that suicidal prisoners receive the level of care and housing classification appropriate to their acuity, as determined by a mental health professional.

15. Ensure that suicidal prisoners receive adequate mental health treatment and follow-up care, including out-of-cell counseling as determined by a mental health professional.

16. Clarify that an order of "constant watch" observation requires that a staff member have an unobstructed view of the prisoner at all times. Video surveillance is not sufficient for a prisoner on "constant watch." Also, ensure that any staff member conducting "constant

watch" observation has no other duties to complete during the time they are conducting the watch.

17. Provide quality, private suicide risk assessments of suicidal prisoners on a daily basis.

18. Ensure that the Jail's quality assurance program is adequately maintained and identify and correct deficiencies with the mental health care system.

19. Provide discharge/transfer planning, including services for prisoners in need of further treatment at the time of transfer to another institution or discharge to the community. These services should include the following:

   a. Arranging an appointment with community mental health providers for all prisoners with serious mental illness and ensuring, to the extent possible, that prisoners meet with that community mental health provider prior to or at the time of discharge to facilitate a warm hand off;

   b. Providing referrals for prisoners with mental health problems that require ongoing treatment post-release;

   c. Notifying reception centers at state prisons when mentally ill prisoners are going to arrive;

   d. Arranging with local pharmacies to have prisoners' prescriptions renewed to ensure that they have an adequate supply to last through their next scheduled appointment.

## C.   Restrictive Housing

The Jail should:

1. Ensure that its policies, procedures, and practices regarding the use of restrictive housing for prisoners with serious mental illness comport with the Constitution.

2. Ensure that if a prisoner shows credible signs of decompensation in restrictive housing, the prisoner's mental health needs are assessed by a mental health professional and promptly addressed.

3. Ensure that prisoners expressing suicidality are not placed in restrictive housing and instead are provided clinically appropriate mental health care.

4. Report and review data regarding lengths of stay in restrictive housing, particularly with respect to prisoners with serious mental illness, and take appropriate corrective action.

### D.  Compliance with the Americans with Disabilities Act

The Jail should:

1. Ensure that its policies, procedures, and practices are reasonably modified and maintained so that prisoners with mental illness are not unnecessarily placed in restrictive housing based on their disabilities.

2. Ensure that prisoners with mental illness who are in restrictive housing have the opportunity to participate in and benefit from services, programs, and activities available to prisoners without disabilities consistent with significant health or safety concerns.

## VI.  CONCLUSION

We have reasonable cause to believe that the Jail has engaged in a pattern or practice of resistance to rights protected by the Eighth and Fourteenth Amendments because it fails to provide prisoners with constitutionally adequate medical and mental health care and places prisoners with serious mental illness in restrictive housing for prolonged periods of time under conditions that violate prisoners' constitutional rights.  We also have reasonable cause to believe that the Jail violates the ADA by placing prisoners with mental illness in restrictive housing because of their disability and failing to provide reasonable accommodations.  We look forward to working cooperatively with the Hampton Roads Regional Jail Authority and the Jail's administrators and staff to ensure that these violations are remedied.